# IN THE SUPREME COURT, STATE OF WYOMING

## 2014 WY 126

OCTOBER TERM, A.D. 2014

*October 9, 2014*

THE STATE OF WYOMING,

Appellant
(Plaintiff),

v.                                              S-13-0223

EDWIN IKE MARES,

Appellee
(Defendant).

*W.R.A.P. 11 Certification from the District Court of Natrona County*
*The Honorable Catherine E. Wilking, Judge*

*Representing Appellant:*
> Peter K. Michael, Wyoming Attorney General; David L. Delicath, Deputy Attorney General; Jenny L. Craig, Senior Assistant Attorney General; and Christyne Martens, Assistant Attorney General. Argument by Ms. Martens.

*Representing Appellee:*
> Diane E. Courselle, Defender Aid Program, University of Wyoming College of Law; and Graham Hersh, Student Director. Argument by Mr. Hersh.

*Representing Amicus Curiae Juvenile Law Center et al:*
> Marsha L. Levick, Philadelphia, PA; and Dona Playton, Laramie, WY.

*Before BURKE, C.J., and HILL, KITE\*, DAVIS, and FOX, JJ.*
\*Chief Justice at time of oral argument.

**NOTICE: This opinion is subject to formal revision before publication in Pacific Reporter Third. Readers are requested to notify the Clerk of the Supreme Court, Supreme Court Building, Cheyenne, Wyoming 82002, of any typographical or other formal errors so that correction may be made before final publication in the permanent volume.**

**HILL,** Justice.

[¶1]    In 1995, Edwin Mares was convicted of felony murder as a juvenile and sentenced to life in prison, which sentence was by operation of law the equivalent of a sentence of life imprisonment without the possibility of parole.  In 2013, Mr. Mares filed a motion, pursuant to Rule 35 of the Wyoming Rules of Criminal Procedure, to correct an illegal sentence.  Through that motion, Mr. Mares contended that his sentence of life without the possibility of parole was unconstitutional in light of the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. ___, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).  This Court accepted certification of two questions from the district court.  The first question concerns the test to be used in determining the retroactivity of new constitutional rules when a judgment is challenged on collateral review.  The second question is whether *Miller* applies retroactively under our chosen test.

[¶2]    We conclude that as a result of amendments to Wyoming's parole statutes in 2013, Mr. Mares' life sentence was changed from one of life imprisonment without the possibility of parole to one of life with the possibility of parole in twenty-five years.  This change occurred by operation of the amended law, and the sentence Mr. Mares challenged in his Rule 35 motion therefore no longer exists.  We are aware, however, that other collateral challenges to juvenile offender sentences are pending throughout our district courts, and we therefore, in the interests of judicial economy and to avoid conflicting rulings, choose to answer the certified questions.  In response to the first certified question, we hold that the proper rule for determining whether a new constitutional rule applies retroactively to cases on collateral review is the test announced by the Supreme Court in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).  In response to the second question, we conclude that under a *Teague* analysis, the rule announced in *Miller* applies retroactively to cases on collateral review.

## CERTIFIED QUESTIONS

[¶3]    The district court certified the following questions to this Court:

>   1)    What is the proper rule for Wyoming courts to use when considering whether a new constitutional rule applies retroactively to cases on collateral review?
>
>   2)    Should the recent decision in *Miller v. Alabama*, 567 U.S. ___, 132 S.Ct. 2455 (2012) be applied retroactively when a collateral attack on a Judgment and Sentence is made in Wyoming?

[¶4]    The State presented the following additional question in its opening brief, raising the issue of mootness:

1

A case is moot when a court's determination of the issues will have no practical effect on the controversy. Mares committed first degree murder as a juvenile and was sentenced to life imprisonment, which at the time did not include the possibility for parole. Because recent amendments brought the sentencing statutes into compliance with the rule from *Miller v. Alabama*, he is now eligible for parole after serving twenty-five years of incarceration. When the basis for a motion to correct an illegal sentence is no longer applicable, is the controversy moot?

[¶5] Mr. Mares responded to the State's mootness question with the following framing of the issue:

Whether the Certified Questions the State/Appellant asked this Court to answer remain justiciable where recent amendments to the sentencing and parole states may make Mr. Mares eligible [for] parole but do not provide for individualized sentencing determinations for juveniles and thus do not fully remedy the violation of *Miller v. Alabama*, 567 U.S. ___, 132 S.Ct. 2455 (2012), in Wyoming's sentencing scheme?

## FACTS

[¶6] In its certification order, the district court provided the following statement of facts related to Mr. Mares' conviction and sentence:

Defendant Mares was charged with felony murder, aggravated burglary, and conspiracy to commit burglary. The charges stemmed from a burglary at a Casper home on November 30, 1993 during which Velma Filener, age seventy-six was killed. Mares and three other defendants were charged. Mares was charged on July 29, 1994. Mr. Mares was convicted at jury trial and sentenced on all three charges. On May 11, 1995 he was sentenced to life in prison on the charge of first-degree murder. In addition, Mr. Mares was sentenced to 20-25 years on the charge of aggravated burglary, to be served concurrently with the first-degree murder sentence, and 4-5 years on the conspiracy charge, to be served consecutively. Mares was sixteen (16) years old on

2

the date of the crime, November 30, 1993. Mares filed a timely appeal.

The Wyoming Supreme Court affirmed the conviction but vacated the sentence for aggravated burglary. *Mares v. State*, 939 P.2d 724 (WY 1997). The Defendant filed a Motion for Sentence Reduction on October 2, 1995. The Motion was denied on October 9, 1995. No appeal was taken from the denial of the Motion.

[¶7]   On June 3, 2013, Mr. Mares filed a motion to correct his sentence pursuant to Rule 35(a) of the Wyoming Rules of Criminal Procedure. Mr. Mares argued that because he was sentenced to a mandatory sentence of life without the possibility of parole for an offense he committed as a juvenile, his sentence was illegal pursuant to *Miller*, 567 U.S. at ___, 132 S.Ct. at 2464, the 2012 decision in which the Supreme Court held that "mandatory life-without-parole sentences for juveniles violate the Eighth Amendment."

[¶8]   On July 1, 2013, legislation enacted to amend Wyoming's sentencing scheme for juveniles convicted of first degree homicide became effective. The revised statutes provide, in part, that "a person convicted of murder in the first degree who was under the age of eighteen (18) years at the time of the offense shall be punished by life imprisonment," and that "[a] person sentenced to life imprisonment for an offense committed before the person reached the age of eighteen (18) years shall be eligible for parole after commutation of his sentence to a term of years or after having served twenty-five (25) years of incarceration." *See* Wyo. Stat. Ann. §§ 6-2-101(b); 6-10-301(c) (LexisNexis 2013). The amended statutes also provide that the Board of Parole may grant parole to a juvenile offender sentenced to life imprisonment. *See* Wyo. Stat. Ann. § 7-13-402(a) (LexisNexis 2013).

[¶9]   On July 3, 2013, the State filed a motion to certify questions of law to this Court, and on October 8, 2013, the district court entered an order granting the motion and certifying questions. On November 6, 2013, this Court issued a Notice of Agreement to Answer Certified Questions.

**STANDARD OF REVIEW**

[¶10] "Certified questions are questions of law that are reviewed *de novo* pursuant to W.R.A.P. 11." *Smith v. State*, 2013 WY 122, ¶ 9, 311 P.3d 132, 135 (Wyo. 2013) (citing *Preston v. Marathon Oil Co.*, 2012 WY 66, ¶ 4, 277 P.3d 81, 83 (Wyo. 2012); *Sublette Cnty. Sch. Dist. No. Nine v. McBride*, 2008 WY 152, ¶ 14, 198 P.3d 1079, 1083 (Wyo. 2008)).

DISCUSSION

[¶11] Through his Rule 35 motion, Mr. Mares asserted that the mandatory sentence of life without the possibility of parole to which he was sentenced as a juvenile violates the Eighth Amendment. Because the Eighth Amendment, and how it has been interpreted to limit the sentencing of juvenile offenders, is central to the issues presented in this appeal, we begin our discussion with a summary of that Eighth Amendment framework. We will then address the present sentence being served by Mr. Mares and the certified questions.

## A.    Eighth Amendment Framework

[¶12] The Eighth Amendment prohibition against cruel and unusual punishment guarantees individuals the right to not be subjected to excessive sanctions or to punishments that are disproportionate to the crime committed. *Miller*, 567 U.S. at ___, 132 S.Ct. at 2463; *Bear Cloud v. State*, 2013 WY 18, ¶ 18, 294 P.3d 36, 41 (Wyo. 2013) (*Bear Cloud II*). The United States Supreme Court has in recent years decided a line of cases setting Eighth Amendment limitations on the sentencing of juvenile offenders, including, most recently, its 2012 decision in *Miller*. Because *Miller* addressed the constitutional parameters of imposing a sentence of life without the possibility of parole on a juvenile offender convicted of homicide, that decision is of particular significance in addressing the issues presented by this appeal. *See Miller*, 567 U.S. at ___, 132 S.Ct. at 2469. We nonetheless start our discussion with the two decisions that preceded *Miller* because those decisions provided the backdrop for the Supreme Court's holding *Miller*.

[¶13] In 2005, the Court decided *Roper v. Simmons*, which held that offenders who were under the age of eighteen when their crimes were committed could not be sentenced to the death penalty. *Roper v. Simmons*, 543 U.S. 551, 578, 125 S.Ct. 1183, 1200, 161 L.Ed.2d 1 (2005). In 2010, the Court decided *Graham v. Florida*, which held that a juvenile offender who committed a non-homicide offense could not be sentenced to life without the possibility of parole. *Graham v. Florida*, 560 U.S. 48, 74-75, 130 S.Ct. 2011, 2030, 176 L.Ed.2d 825 (2010). In this Court's decision in *Bear Cloud II*, the first decision in which this Court was asked to determine the constitutionality of Wyoming's juvenile sentencing scheme in light of *Miller*, we summarized the *Roper* and *Graham* holdings as follows:

> Commencing in 2005, the United States Supreme Court issued a series of decisions pertaining to the Eighth Amendment's effect on juveniles. In *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), the Court held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Id*., 543

U.S. at 578, 125 S.Ct. at 1200.

Importantly, the Court discussed differences between juveniles and adult offenders, including: (1) a juvenile's "lack of maturity and an underdeveloped sense of responsibility;" (2) a juvenile's increased susceptibility to "negative influences and outside pressures, including peer pressure;" and (3) the idea that "the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." *Id.*, 543 U.S. at 569–70, 125 S.Ct. at 1195. These differences between juveniles and adults would play a pivotal role in *Miller*.

. . . .

Next, in *Graham*, the Court held that "for a juvenile offender who did not commit homicide the Eighth Amendment forbids the sentence of life without parole." *Id.*, 560 U.S. at [74-75], 130 S.Ct. at 2030. The Court continued, "A juvenile is not absolved of responsibility for his actions, but his transgression 'is not as morally reprehensible as that of an adult.'" *Id.*, 560 U.S. at [68], 130 S.Ct. at 2026. Again the Court commented on the inherent differences between adult and juvenile offenders:

No recent data provide reason to reconsider the Court's observations in *Roper* about the nature of juveniles. As petitioner's *amici* point out, developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence. Juveniles are more capable of change than are adults, and their actions are less likely to be evidence of "irretrievably depraved character" than are the actions of adults. *Roper*, 543 U.S., at 570, 125 S.Ct. 1183. It remains true that "[f]rom a moral standpoint it would be misguided to equate the failings of a minor with those of an adult, for a greater possibility exists that a minor's character deficiencies will be reformed." *Ibid*. These matters relate to the status of the offenders in question; and it is relevant to consider next the nature of the offenses

5

> to which this harsh penalty might apply.
>
> *Id.*, 560 U.S. at 68-69, 130 S.Ct. at 2026–27 (some citations omitted).

*Bear Cloud II*, ¶¶ 21-23, 294 P.3d at 42.

[¶14] Following the *Roper* and *Graham* decisions, the Supreme Court issued its 2012 decision in *Miller*, which ruled that the Eighth Amendment bars a court from sentencing a juvenile offender to mandatory life imprisonment without the possibility of parole. *See Miller*, 567 U.S. at ___, 132 S.Ct. at 2464. The *Miller* Court held:

> The two 14–year–old offenders in these cases were convicted of murder and sentenced to life imprisonment without the possibility of parole. In neither case did the sentencing authority have any discretion to impose a different punishment. State law mandated that each juvenile die in prison even if a judge or jury would have thought that his youth and its attendant characteristics, along with the nature of his crime, made a lesser sentence (for example, life *with* the possibility of parole) more appropriate. Such a scheme prevents those meting out punishment from considering a juvenile's "lessened culpability" and greater "capacity for change," *Graham v. Florida*, 560 U.S. 48, ——, ——, 130 S.Ct. 2011, 2026–2027, 2029–2030, 176 L.Ed.2d 825 (2010), and runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties. We therefore hold that mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on "cruel and unusual punishments."

*Miller*, 567 U.S. at ___, 132 S.Ct. at 2460.

[¶15] In this Court's decision in *Bear Cloud II*, we observed as follows concerning the *Miller* court's sentencing limitations:

> Notably, the *Miller* majority refused to categorically bar sentencing juveniles to life imprisonment without the possibility of parole. The Court stated that [although] "we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require [the sentencer] to take into account how children are different, and how those differences

6

counsel against irrevocably sentencing them to a lifetime in prison." *Id.*, 567 U.S. at ——, 132 S.Ct. at 2468 (footnote omitted). The Court went on to note, however, that such sentences should be "uncommon":

> But given all we have said in *Roper*, *Graham* and this decision about children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon. That is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at the early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'

*Id.*, 567 U.S. at ——, 132 S.Ct. at 2469.

> In sum, *Miller* requires

> a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles. By requiring that all children convicted of homicide receive lifetime incarceration without possibility of parole, regardless of their age and age-related characteristics and the nature of their crimes, the mandatory sentencing schemes before us violate this principle of proportionality, and so the Eighth Amendment's ban on cruel and unusual punishment.

*Id.*, 567 U.S. at ——, 132 S.Ct. at 2475.

*Bear Cloud II*, ¶¶ 27-28, 294 P.3d at 43-44.

[¶16] Using this Eighth Amendment framework, we turn to Mr. Mares' sentence, his Rule 35 motion, and the certified questions.

## B.    Sentence Presently Being Served by Mr. Mares

[¶17] Through his Rule 35 motion, Mr. Mares contends that his life imprisonment sentence is the equivalent of life imprisonment without the possibility of parole and that his sentence was therefore entered in violation of *Miller*. The State contends that while Mr. Mares may have originally been sentenced to life imprisonment without parole, the

7

2013 amendments operated to convert his sentence to one of life with the possibility of parole in twenty-five years. The State argues that as a result of this automatic conversion of Mr. Mares' sentence, he is no longer entitled to the sentencing hearing prescribed by *Miller*, and the certified questions should therefore be dismissed as moot. While we agree that Mr. Mares' sentence has been converted by operation of the amended parole statutes, we do not agree that dismissal of the certified questions is proper under these circumstances. We address first the conversion of Mr. Mares' sentence.

[¶18] In 1995, the district court sentenced Mr. Mares to "a term continuously through the Defendant's natural life for the charge of felony murder." The first degree homicide statute under which Mr. Mares was convicted and sentenced provided:

> (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.
>
> (b) A person convicted of murder in the first degree shall be punished by death or life imprisonment according to law, except that no person shall be subject to the penalty of death for any murder committed before the defendant attained the age of sixteen (16) years.

Wyo. Stat. Ann. § 6-2-101 (Michie 1995).

[¶19] Under the parole statutes in effect when Mr. Mares was convicted and sentenced, the Board of Parole had authority to "grant a parole to any person imprisoned in any institution under sentence, except a life sentence." Wyo. Stat. Ann. § 7-13-402(a) (Michie 1995). This means that as originally sentenced, Mr. Mares was eligible for parole only upon commutation of his sentence by the governor. Mr. Mares' original sentence was therefore, by operation of law, the functional equivalent of life without the possibility of parole. *See Bear Cloud II*, ¶ 33, 294 P.3d at 45 (life sentence providing opportunity for parole only on commutation of sentence by governor had practical effect of mandating life in prison without possibility of parole).

[¶20] On February 8, 2013, this Court issued a ruling in which we held that Wyoming's first degree homicide sentencing and parole scheme violated the Eighth Amendment when applied to a defendant who committed the homicide as a juvenile because of the scheme's practical effect of mandating life in prison without the possibility of parole. *Bear Cloud II*, ¶ 34, 294 P.3d at 45. On February 14, 2013, the Governor approved a

8

legislative enactment amending the sentencing and parole statutes, which act provided an effective date of July 1, 2013 and described its purpose as:

> AN ACT relating to crimes and offenses; modifying provisions relating to life sentences for juvenile offenders generally; eliminating life sentences without parole for juvenile offenders; and providing for an effective date.

2013 Wyo. Sess. Laws, ch. 18 at 75-76.

[¶21] The amended statutes relevant to determining the present sentence Mr. Mares is serving are Wyo. Stat. Ann. § 6-10-301,which defines the terms under which parole may be granted to an offender serving a life sentence, and Wyo. Stat. Ann. § 7-13-402(a), which speaks to the Board of Parole's authority. These two amended statutes provide:

> Any sentence other than a sentence specifically designated as a sentence of life imprisonment without parole is subject to commutation by the governor. A person sentenced to life imprisonment for an offense committed after the person reached the age of eighteen (18) years is not eligible for parole unless the governor has commuted the person's sentence to a term of years. A person sentenced to life imprisonment for an offense committed before the person reached the age of eighteen (18) years shall be eligible for parole after commutation of his sentence to a term of years or after having served twenty-five (25) years of incarceration, except that if the person committed any of the acts specified in W.S. 7-13-402(b) after having reached the age of eighteen (18) years the person shall not be eligible for parole.

Wyo. Stat. Ann. § 6-10-301(c) (LexisNexis 2013).

> The board may grant a parole to any person imprisoned in any institution under sentence, except a sentence of life imprisonment without parole or a life sentence, ordered by any district court of this state, provided the person has served the minimum term pronounced by the trial court less good time, if any, granted under rules promulgated pursuant to W.S. 7-13-420. The board may also grant parole to a person serving a sentence for an offense committed before the person reached the age of eighteen (18) years of age as provided in W.S. 6-10-301(c).

Wyo. Stat. Ann. § 7-13-402(a) (LexisNexis 2013).

[¶22] The question we must answer to determine the sentence Mr. Mares is presently serving is whether these amended statutes changed Mr. Mares' sentence. The State has taken the position, both on appeal and in a formal Attorney General's opinion, that the amended statutes operate to convert Mr. Mares' sentence from life without the possibility of parole to a sentence of life with the possibility of parole in twenty-five years. *See* Wyo. Op. Att'y Gen. 2013-001 (2013 WL 6069447). Mr. Mares agrees that this is the effect of the amended statutes, but he questions the sincerity of the State's adherence to this interpretation. Although the parties are in agreement as to the effect of the amended statutes, we address this issue to confirm that indeed the amended statutes do apply to the preexisting class of juvenile defendants currently serving life sentences.

[¶23] As a starting point in our consideration of the amended statutes and their effect on the sentences of juvenile defendants currently serving life sentences, we acknowledge that statutory amendments generally apply prospectively unless they are made retroactive by their express terms. *Greene v. State*, 2009 WY 99, ¶¶ 12-13, 214 P.3d 222, 225-26 (Wyo. 2009) (citing Wyo. Stat. Ann. § 8-1-107). The amended parole and life imprisonment statutes do not expressly provide that they are to apply retroactively, and we therefore assume a prospective application only. That leaves the Court to determine how the prospective operation of the amended statutes affects the existing sentences of juvenile defendants serving a life sentence. This is a question of statutory interpretation, which is a task we approach using the following rules of interpretation:

> In interpreting statutes, our primary consideration is to determine the legislature's intent. All statutes must be construed *in pari materia* and, in ascertaining the meaning of a given law, all statutes relating to the same subject or having the same general purpose must be considered and construed in harmony. Statutory construction is a question of law, so our standard of review is de novo. We endeavor to interpret statutes in accordance with the legislature's intent. We begin by making an inquiry respecting the ordinary and obvious meaning of the words employed according to their arrangement and connection. We construe the statute as a whole, giving effect to every word, clause, and sentence, and we construe all parts of the statute *in pari materia*. When a statute is sufficiently clear and unambiguous, we give effect to the plain and ordinary meaning of the words and do not resort to the rules of statutory construction. Moreover, we must not give a statute a meaning that will nullify its operation if it is susceptible of another interpretation.

10

Moreover, we will not enlarge, stretch, expand, or extend a statute to matters that do not fall within its express provisions.

*Rock v. Lankford*, 2013 WY 61, ¶ 19, 301 P.3d 1075, 1080 (Wyo. 2013) (quoting *Redco Const. v. Profile Props., LLC*, 2012 WY 24, ¶ 26, 271 P.3d 408, 415-16 (Wyo. 2012)).

[¶24] In a 2013 formal opinion addressing the amended parole and life imprisonment statutes, the Attorney General applied these rules of interpretation and concluded as follows concerning the amended statutes:

> Nothing in the plain language of Wyo. Stat. Ann. §§ 7-13-402(a) and 6-10-301(c) addresses the laws in effect at the time the juvenile offender commit[t]ed the crime or suggests that either statute would apply retroactively. Instead, Wyo. Stat. Ann. § 7-13-402 generally sets forth the powers and duties of the Board of Parole (Board). Wyo. Stat. Ann. § 7-13-402. Subsection (a) specifically gives the Board authority to grant parole to a qualified class of people. Wyo. Stat. Ann. § 7-13-402(a). The class of people to whom the Board may grant parole is broadly defined as "any person imprisoned in any institution under sentence." *Id*. However, the remainder of the first sentence of subsection (a) is devoted to exceptions and qualifications to that broad rule. *Id*.

> The second sentence of Wyo. Stat. Ann. § 7-13-402(a) then specifically grants the Board the authority to parole a different class of inmates—juvenile offenders—according to the terms of Wyo. Stat. Ann. § 6-10-301(c). *Id*.

> . . . .

> In keeping with the presumption that statutory amendments apply prospectively, Wyo. Stat. Ann. §§ 7-13-402(a) and 6-10-301(c) must be understood as addressing the Board's **current** authority to grant parole and the **current** eligibility of the qualified class of people they define. Further, there is no mention in either section of any sort of parole eligibility limitation based on the date the crime was committed or the laws in effect at the time. Wyo. Stat. Ann. §§ 7-13-402(a), 6-10-301(c). Therefore, to limit the Board's authority to grant parole or eligibility for parole based on the laws in effect at the time of the commission of the crime would read something into the statute not contained in its

express terms. As a result, the 2013 amendments to Wyo. Stat. Ann. §§ 6-10-301(c) and 7-13-402(a) allow the Board to grant parole to qualifying juvenile offenders, regardless of the laws in effect at the time of their offense.

Wyo. Op. Att'y Gen. 2013-001 at 2-3 (2013 WL 6069447 at *3) (emphasis in original).

[¶25] We find no fault in this analysis and agree that the amended statutes govern parole eligibility for juveniles already serving life sentences when the amendments became effective. We comment further only to emphasize that the language of amended Wyo. Stat. Ann. § 6-10-301(c) is mandatory. It provides that a qualifying juvenile serving a life sentence **shall** be eligible for parole after having served twenty-five years of incarceration. Thus, not only does the Board of Parole have the authority to consider a qualifying juvenile for parole, it must give a qualifying juvenile the opportunity to be considered for parole after that juvenile has served twenty-five years of incarceration.

[¶26] Based on the foregoing, we conclude that, by operation of the amended parole statutes, the current sentence Mr. Mares is serving for his first degree homicide conviction is life with the possibility of parole after twenty-five years of incarceration. Mr. Mares was originally sentenced to life imprisonment, and it was by operation of law that Mr. Mares' sentence functioned as life without the possibility of parole. It is now by operation of law that Mr. Mares' life sentence has been converted to one that makes him eligible for parole on that sentence after twenty-five years of incarceration. Because Mr. Mares' sentence has been changed by the operation of the amended statutes, an order by the district court is not required to implement that revised sentence. The same is true of any other juvenile offender similarly situated. Any juvenile offender sentenced to life imprisonment under the former law is now, by operation of the amended parole statutes, serving a sentence of life imprisonment with eligibility for parole in twenty-five years, and a juvenile offender serving such a sentence is not required to file a Rule 35 motion to implement that revised sentence.

## C.     State's Mootness Argument

[¶27] Mr. Mares filed his Rule 35 motion based on the sentence originally imposed on him and not to redress his sentence as revised by the 2013 change in law. There is therefore some merit to the State's contention that our answers to the certified questions will not affect Mr. Mares' Rule 35 motion as it is presently framed before the district court. Stated differently, Mr. Mares has not requested a *Miller* hearing on his revised sentence, and our answers to the certified questions will therefore arguably have no impact on his current Rule 35 motion. Nonetheless, we decline the State's request to dismiss the certified questions.

[¶28]  It was the State that moved to certify questions to this Court, and in so moving, the State offered the following in support of its motion:

> 4.     That to your undersigned's knowledge there are four (4) other cases presently pending in three (3) other Wyoming District Courts which will raise the issue of whether *Miller v. Alabama* applies retroactively to grant relief to individuals on collateral attack of judgment and sentence.
>
> . . . .
>
> 6.     There does not appear to be any controlling decision in the State of Wyoming as to whether *Miller v. Alabama* will be applied retroactively to collateral attacks on the judgment and sentence.  As is outlined in the State's response to the motion, there is a split of authority within the United States over whether *Miller v. Alabama* will be applied retroactively.  There are presently pending several decisions before State Supreme Courts to determine whether in fact it will apply retroactively.

[¶29]  To the best of the Court's knowledge, these conditions remain true, and they counsel against dismissing the certified questions.  Indeed, we have observed that in certain circumstances appeals that may be technically moot or not ripe for review should nonetheless be answered in the interest of judicial economy and to avoid conflicting rulings.

> The decision will involve the status of a number of prisoners convicted and presently serving sentences as convicts under that section and could have other far-reaching effects on others as will be developed later in this opinion.  To save delay and the possibility of a multiplicity of suits by way of habeas corpus actions and post-conviction proceedings as well as coram nobis which could result in a conflict of rulings in the several judicial districts of the state, we deem it of public interest to take jurisdiction for prompt and uniform application and disposition of the question as it may arise in the future and to settle the concern of those immediately affected.
>
> The post-conviction proceeding raised a question which has become moot and upon the suggestion of appellant-defendant, the appeal should be dismissed for that reason, but the appeal record can be used to assist in touching a question of landmark proportions.

*Ostwald v. State*, 538 P.2d 1298, 1300 (Wyo. 1975) (footnote omitted); *see also Landeroz v. State*, 2011 WY 168, ¶ 16, 267 P.3d 1075, 1079 (Wyo. 2011) (rejecting ripeness doctrine as basis to dismiss double jeopardy claim where judicial economy promoted by answering question whether State could in future re-file attempted first degree murder charge).

[¶30]   Because these same interests are implicated by the certified questions, we will, in the interests of judicial economy and to avoid conflicting rulings, answer the certified questions.

### D.     <u>Certified Questions</u>

*Certified Question No. 1:  What is the proper rule for Wyoming courts to use when considering whether a new constitutional rule applies retroactively to cases on collateral review?*

[¶31]  The parties do not express any particular disagreement as to the first certified question.  Both parties urge this Court to follow the retroactivity analysis set forth in *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) and its progeny to determine whether the rule announced in *Miller* applies retroactively to cases on collateral review.  On the other hand, neither party particularly objects to application of the retroactivity test set forth in *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).  The parties each contend that the answer to the second certified question is the same on application of either test, though they of course disagree on what that answer should be.

[¶32]  The United States Supreme Court has held that while its retroactivity analysis strictly governs whether a new constitutional rule will be given retroactive effect in federal cases on collateral review, the analysis is not mandatory in state courts.  *Danforth v. Minnesota*, 552 U.S. 264, 282, 128 S.Ct. 1029, 1042, 169 L.Ed.2d 859 (2008).  A state court is "free to choose the degree of retroactivity or prospectivity" that it finds appropriate to the particular rule under consideration, so long as it gives federal constitutional rights at least as broad a scope as the United States Supreme Court requires.  *Danforth*, 552 U.S. at 276, 128 S.Ct. at 1039 (quoting *State v. Fair*, 502 P.2d 1150, 1152 (Ore. 1972)).  The Supreme Court explained that its retroactivity analysis

> limits the kinds of constitutional violations that will entitle an individual to relief on federal habeas, but does not in any way limit the authority of a state court, when reviewing its own state criminal convictions, to provide a remedy for a violation that is deemed "nonretroactive" under [the Supreme Court's retroactivity analysis].

*Danforth*, 552 U.S. at 282, 128 S.Ct. at 1042.

[¶33] The question we must answer then is whether this Court will adopt the retroactivity analysis developed by the United States Supreme Court or choose an analysis that provides for a broader retroactive application of new constitutional rules. We begin with an overview of the Supreme Court's retroactivity rules and then address whether the Supreme Court's *Teague* analysis fits with this Court's approach to determining retroactivity of new rules.

## 1.     <u>Summary of Supreme Court Retroactivity Analysis</u>

[¶34]   The evolution of the Supreme Court's retroactivity analysis, which culminated in what is now known as the *Teague* rule, was summarized as follows in *Danforth*:

> Our decision today must also be understood against the backdrop of our somewhat confused and confusing "retroactivity" cases decided in the years between 1965 and 1987. Indeed, we note at the outset that the very word "retroactivity" is misleading because it speaks in temporal terms. "Retroactivity" suggests that when we declare that a new constitutional rule of criminal procedure is "nonretroactive," we are implying that the right at issue was not in existence prior to the date the "new rule" was announced. But this is incorrect. As we have already explained, the source of a "new rule" is the Constitution itself, not any judicial power to create new rules of law. Accordingly, the underlying right necessarily pre-exists our articulation of the new rule. What we are actually determining when we assess the "retroactivity" of a new rule is not the temporal scope of a newly announced right, but whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant to the relief sought.
>
> . . . .
>
> In *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), the Court expressly considered the issue of "retroactivity" for the first time. Adopting a practical approach, we held that the retroactive effect of each new rule should be determined on a case-by-case basis by examining the purpose of the rule, the reliance of the States on the prior law, and the effect on the administration of justice of retroactive application of the rule. *Id.*, at 629, 85 S.Ct. 1731.

15

Applying those considerations to the exclusionary rule announced in *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), we held that the *Mapp* rule would not be given retroactive effect; it would not, in other words, be applied to convictions that were final before the date of the *Mapp* decision. *Linkletter*, 381 U.S., at 636–640, 85 S.Ct. 1731.

During the next four years, application of the *Linkletter* standard produced strikingly divergent results. As Justice Harlan pointed out in his classic dissent in *Desist v. United States*, 394 U.S. 244, 257, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969), one new rule was applied to all cases subject to direct review, *Tehan v. United States ex rel. Shott*, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966); another to all cases in which trials had not yet commenced, *Johnson v. New Jersey*, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); another to all cases in which tainted evidence had not yet been introduced at trial, *Fuller v. Alaska*, 393 U.S. 80, 89 S.Ct. 61, 21 L.Ed.2d 212 (1968) (per curiam); and still others only to the party involved in the case in which the new rule was announced and to all future cases in which the proscribed official conduct had not yet occurred, *Stovall v. Denno*, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); *DeStefano v. Woods*, 392 U.S. 631, 88 S.Ct. 2093, 20 L.Ed.2d 1308 (1968) (per curiam). He reasonably questioned whether such decisions "may properly be considered the legitimate products of a court of law, rather than the commands of a super-legislature." 394 U.S., at 259, 89 S.Ct. 1030.

Justice Harlan's dissent in *Desist*, buttressed by his even more searching separate opinion in *Mackey v. United States*, 401 U.S. 667, 675, 91 S.Ct. 1160, 28 L.Ed.2d 404 (1971) (opinion concurring in judgments in part and dissenting in part), and scholarly criticism, laid the groundwork for the eventual demise of the *Linkletter* standard. In *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), the Court rejected as "unprincipled and inequitable" the application of the *Linkletter* standard to cases pending on direct review. In *Teague*, Justice O'Connor reaffirmed *Griffith's* rejection of the *Linkletter* standard for determining the "retroactive" applicability of new rules to state convictions that were not yet final and rejected the

16

*Linkletter* standard for cases pending on federal habeas review. She adopted (with a significant modification) the approach advocated by Justice Harlan for federal collateral review of final state judgments.

Justice O'Connor endorsed a general rule of nonretroactivity for cases on collateral review, stating that "[u]nless they fall within an exception to the general rule, new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." 489 U.S., at 310, 109 S.Ct. 1060 (plurality opinion). The opinion defined two exceptions: rules that render types of primary conduct " 'beyond the power of the criminal law-making authority to proscribe,' " *id*., at 311, 109 S.Ct. 1060, and "watershed" rules that "implicate the fundamental fairness of the trial," *id*., at 311, 312, 313, 109 S.Ct. 1060.

*Danforth*, 552 U.S. at 271-75, 128 S.Ct. at 1035-38 (footnotes omitted).

[¶35] The Supreme Court's *Teague* retroactivity analysis has been described as the "leading modern precedent on retroactivity." *Danforth*, 552 U.S. at 292, 128 S.Ct. at 1048 (Roberts, C.J., dissenting). The *Teague* analysis, after some refinement through subsequent decisions, is summarized as follows:

When a decision of this Court results in a "new rule," that rule applies to all criminal cases still pending on direct review. As to convictions that are already final, however, the rule applies only in limited circumstances. New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish. Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him.

New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with

use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of "'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." That a new procedural rule is "fundamental" in some abstract sense is not enough; the rule must be one "without which the likelihood of an accurate conviction is *seriously* diminished." This class of rules is extremely narrow, and "it is unlikely that any ... 'ha[s] yet to emerge.'"

*Schriro v. Summerlin*, 542 U.S. 348, 351-52, 124 S.Ct. 2519, 2522-23,159 L.Ed.2d 442 (2004) (citations omitted).

[¶36] The rationale underlying the *Teague* framework for determining retroactivity has been explained by one court as follows:

> According to *Teague,* "new rules should always be applied retroactively to cases on direct review, but ... generally they should not be applied retroactively to criminal cases on collateral review." The rationale for the distinction is that collateral review is not designed as a substitute for direct review and that the government has a legitimate interest in having judgments become and remain final.

*State v. Mantich*, 842 N.W.2d 716, 723 (Neb. 2014) (citations and footnotes omitted).

[¶37] The *Stovall* retroactivity analysis was drawn from *Linkletter* and predated *Teague*. The *Stovall* Court articulated the following retroactivity criteria:

> The criteria guiding resolution of the question implicates (a) the purpose to be served by the new standards, (b) the extent of the reliance by law enforcement authorities on the old standards, and (c) the effect on the administration of justice of a retroactive application of the new standards. '(T)he retroactivity or nonretroactivity of a rule is not automatically determined by the provision of the Constitution on which the dictate is based. Each constitutional rule of criminal procedure has its own distinct functions, its own background of precedent, and its own impact on the administration of justice, and the way in which these factors combine must inevitably vary with the dictate involved.' *Johnson*, *supra*, at 728, 86 S.Ct. at 1778.

*Stovall*, 388 U.S. at 297, 87 S.Ct. at 1970.

## 2.   *Teague* **Adopted as Preferred Retroactivity Analysis**

[¶38]  This Court has historically used the *Stovall* criteria to analyze the retroactivity of new rules.  *See Bailey v. State*, 12 P.3d 173, 178 (Wyo. 2000); *Farbotnik v. State*, 850 P.2d 594, 601 (Wyo. 1993); *Engberg v. Meyer*, 820 P.2d 70, 76 n.1 (Wyo. 1991); *Ostwald*, 538 P.2d at 1303-04.  In each of these cases, however, the new rule at issue related to state law decisions of this Court, as opposed to new constitutional rules announced by the United States Supreme Court.  The present case provides the first opportunity for this Court to consider the rule we will use in analyzing the retroactivity of a new constitutional rule on collateral review.  Answering this question requires that we examine the interests served by the competing retroactivity analyses and determine which approach best serves the interests this Court has stressed in our judgments.  We are aided in this task by the analyses of other state courts that have been presented with the same question.

[¶39]  In 2010, the Idaho Supreme Court was presented with a question concerning the retroactive application of a new constitutional rule on collateral review of a conviction. *Rhoades v. State*, 233 P.3d 61, 64 (Idaho 2010).  In addressing that issue, the court was required to decide whether it would use the *Linkletter/Stovall* analysis it had historically relied upon or whether it would adopt the *Teague* analysis.  *Id*.  In considering the question, the court observed that a large number of states and the District of Columbia have adopted the *Teague* analysis.  *Id*. at 65-66; *see also Windom v. State*, 886 So.2d 915, 943 (Fla. 2004) (reporting that to date twenty-eight state supreme courts and the District of Columbia had adopted the *Teague* analysis).  The Idaho court ultimately decided in favor of and adopted the *Teague* analysis, explaining:

> When contrasted with the *Linkletter* approach, it is evident that *Teague* provides a simpler and more predictable test for determining whether decisions are given retroactive effect.  The *Teague* approach advances an important interest: the finality of judgments.  The *Teague* approach generally avoids the retroactive application of a new rule of law to judgments, based upon trials that were not fundamentally unfair and had adequate truth-finding procedures, that were final when the new rule was announced.

*Rhoades*, 233 P.3d at 69; *see also Diatchenko v. Dist. Attorney for Suffolk Dist.*, 1 N.E.3d 270, 278 (Mass. 2013) (citations omitted) ("Our desire for a clearly defined standard for assessing the retroactivity of a particular rule, coupled with 'our concern that the finality

of convictions not be unduly disturbed,' *** led to our adoption of the *Teague* retroactivity framework[.]").

[¶40]  In adopting the *Teague* analysis, the Idaho court acknowledged the criticisms that had been leveled at the *Teague* approach and responded to those concerns:

> The Nevada Supreme Court noted that the U.S. Supreme Court has applied *Teague* so strictly "that decisions defining a constitutional safeguard rarely merit application on collateral review." *Colwell v. State*, 118 Nev. 807, 59 P.3d 463, 471 (2002).  While considering the *Teague* approach sound in principle, the Nevada Supreme Court leveled two main criticisms of the U.S. Supreme Court's application of *Teague*. First, the U.S. Supreme Court interprets a "new rule" so broadly that most rules are considered new and given only prospective effect, absent an exception. *Id*.  The Court considers a decision new even when it is controlled or governed by prior law and is the most reasonable interpretation of that law, unless no other interpretation is reasonable. *Id*. (citing *Butler v. McKellar*, 494 U.S. 407, 415, 110 S.Ct. 1212, 1217–18, 108 L.Ed.2d 347, 356–57 (1990); *Lambrix v. Singletary*, 520 U.S. 518, 538, 117 S.Ct. 1517, 1530, 137 L.Ed.2d 771, 793 (1997)).  Second, the U.S. Supreme Court narrowly construes the two exceptions. *Id*. One exception applies when primary, private individual conduct has been placed beyond criminal proscription. *Id*. (quoting *Teague*, 489 U.S. at 311, 109 S.Ct. at 1075–76, 103 L.Ed.2d at 356–57).  The other applies only to watershed rules of fundamental fairness. *Id*. In order to qualify as a watershed rule of fundamental fairness, a rule must improve accuracy and alter our understanding of the bedrock procedural elements essential to the fairness of a proceeding. *Id*.  The U.S. Supreme Court has found no watershed rules in the 19 years since it adopted *Teague*. *Danforth*, 761 N.W.2d at 500.

*Rhoades*, 233 P.3d at 69-70; *see also Colwell v. Leapley*, 458 N.W.2d 514, 517-18 (S.D. 1990) (citing similar concerns regarding the narrowness of *Teague* retroactivity and choosing *Linkletter* analysis over *Teague* analysis).

[¶41]  The Idaho court rejected these concerns regarding the *Teague* approach and responded to them as follows:

While the U.S. Supreme Court has strictly interpreted *Teague* to avoid excessive interference by federal habeas courts in state criminal convictions that have become final, this Court does not have a similar concern for comity when interpreting whether a decision pronounces a new rule of law for purposes of applying *Teague*. As the holding in *Danforth v. Minnesota*, 552 U.S. 264, 128 S.Ct. 1029, 169 L.Ed.2d 859 (2008), makes clear, when deciding whether to give retroactive effect to a decision of the U.S. Supreme Court, this Court is not required to blindly follow that court's view of what constitutes a new rule or whether a new rule is a watershed rule.

Rather, in the future, the decisions of the courts of this state whether to give retroactive effect to a rule of law should reflect independent judgment, based upon the concerns of this Court and the "uniqueness of our state, our Constitution, and our long-standing jurisprudence." *State v. Donato*, 135 Idaho 469, 472, 20 P.3d 5, 8 (2001) (noting that when this Court has found that the Idaho Constitution provides greater protection than the U.S. Constitution, it has done so, "on the uniqueness of our state, our Constitution, and our long-standing jurisprudence"). We note that the Minnesota Supreme Court will likewise independently review cases when applying the *Teague* standard. *Danforth*, 761 N.W.2d at 500.

*Rhoades*, 233 P.3d at 70.

[¶42]  The Colorado Supreme Court chose the *Teague* analysis over the *Stovall/Linkletter* analysis for reasons similar to those of the Idaho and Massachusetts courts, noting that in doing so it was joining the ranks of the majority of states. *Edwards v. People*, 129 P.3d 977, 983 (Colo. 2006). The *Edwards* court described the concept of finality as "an important landmark on the Colorado criminal justice landscape," and found the *Teague* analysis achieved that goal while preventing constitutional injustice. *Id*. at 982. It explained:

The Court in *Teague* emphasizes finality as an underlying consideration for its decision. But the Court also acknowledges that a balance must be struck between honoring finality and preventing injustice: "[t]he fact that life and liberty are at stake in criminal prosecutions shows only that conventional notions of finality should not have *as much* place in criminal as in civil litigation, not that they should

have *none*." *Teague*, 489 U.S. at 309, 109 S.Ct. 1060 (citations and internal quotation marks omitted). Thus, while the *Teague* test underscores the preservation of finality, it allows for the prevention of injustice in the most egregious instances through its exceptions to the general rule that new constitutional rules of criminal procedure do not apply retroactively to cases on collateral review.

*Edwards*, 129 P.3d at 982.

[¶43]  This Court, like the Idaho and Colorado courts, has long stressed the importance of finality in criminal judgments:

> . . . [T]his Court has recognized the importance of finality in criminal cases in other areas as well. This Court has limited the doctrine of retroactivity in the interests of the finality of a criminal case. *See Farbotnik v. State*, 850 P.2d 594, 602 (Wyo.1993) ("The interest of the State in achieving finality justifies limited retroactivity."); *Brown v. State*, 816 P.2d 818, 847 (Wyo.1991) (Discussing the viability of recanted testimony presented in a motion for a new trial, this Court stated: "But the viability of the system also requires that criminal justice be administered efficiently and that the public have faith in the finality of judgments.").

*Nixon v. State*, 2002 WY 118, ¶ 25, 51 P.3d 851, 858 (Wyo. 2002); *see also Ostwald*, 538 P.2d at 1304 (discussing the need for finality and the impact of retroactivity on administration of justice and the integrity of the judicial process).

[¶44]  In *Nixon*, this Court in fact drew on principles cited in and underlying the *Teague* analysis in describing the "detrimental effect" of collateral attacks on final criminal judgments:

> Nonetheless, we repeatedly have recognized that collateral attacks raise numerous concerns not present on direct review. Most profound is the effect on finality. **It goes without saying that, at some point, judicial proceedings must draw to a close and the matter deemed conclusively resolved; no society can afford forever to question the correctness of its every judgment.** "The writ," however, "strikes at finality," *McCleskey v. Zant*, 499 U.S. 467, 491, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991), depriving the criminal law "of much of its deterrent effect," *Teague v.*

*Lane*, 489 U.S. 288, 309, 109 S.Ct. 1060, 1074, 103 L.Ed.2d 334 (1989) (plurality opinion), and sometimes preventing the law's just application altogether, *see McCleskey*, *supra*, 499 U.S., at 491, 111 S.Ct., at 1468. **"No one, not criminal defendants, not the judicial system, not society as a whole is benefitted by a judgment providing a man shall tentatively go to jail today, but tomorrow and every day thereafter his continued incarceration shall be subject to fresh litigation."** *Mackey v. United States*, 401 U.S. 667, 691, 91 S.Ct. 1160, 1179, 28 L.Ed.2d 404 (1971) (Harlan, J., concurring in part and dissenting in part); *see also McCleskey*, *supra*, 499 U.S., at 492, 111 S.Ct., at 1469.

*Nixon*, ¶ 28, 51 P.3d at 858-59 (quoting *Withrow v. Williams*, 507 U.S. 680, 698, 113 S.Ct. 1745, 1756–57, 123 L.Ed.2d 407 (1993) (emphasis added)).

[¶45] Given this Court's longstanding adherence to a retroactivity analysis that recognizes the need for finality in criminal judgments, while at the same time attending to constitutional justice, we are persuaded that the *Teague* analysis, which balances both interests, is the proper analysis for Wyoming courts to apply in determining the retroactivity of new constitutional rules in cases on collateral review. In adopting this approach, we emphasize that, like the Idaho court, this Court may apply the *Teague* analysis more liberally than the United States Supreme Court would otherwise apply it where a particular state interest is better served by a broader retroactivity ruling.

[¶46] Having answered the first certified question with a holding that the *Teague* retroactivity analysis will govern our determination of whether *Miller* applies retroactively on collateral review, we turn to the second certified question.

***Certified Question No. 2: Should the recent decision in Miller v. Alabama, 567 U.S. ___, 132 S.Ct. 2455 (2012) be applied retroactively when a collateral attack on a Judgment and Sentence is made in Wyoming?***

[¶47] We outlined the *Teague* retroactivity analysis above and will discuss it in greater detail in this section. Summarized in general terms, under *Teague*, a new constitutional rule is retroactive on collateral review of a judgment if the new rule is substantive rather than procedural. If the new rule is procedural, it is retroactive only if the rule is a "watershed rule." The State argues that the *Miller* rule is purely procedural, it is not a watershed rule, and it therefore does not apply retroactively. Mr. Mares contends that the *Miller* rule is a substantive rule that does apply retroactively. We agree with Mr. Mares that *Miller* prescribes a substantive rule, and that under *Teague*, the rule applies retroactively to cases on collateral review.

23

[¶48] In our discussion of *Teague* above, we outlined the *Teague* analysis as summarized and refined by the Supreme Court's 2004 decision in *Schriro*, 542 U.S. at 351-52, 124 S.Ct. at 2522-23. The Illinois Supreme Court, drawing from the same *Schriro* summary, has framed the analysis in a manner we find clear and workable:

> A judicial decision that establishes a new constitutional rule applies to all criminal cases pending on direct review. *Schriro v. Summerlin*, 542 U.S. 348, 351, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004). … However, as to convictions that are already final, the new rule is not to be applied retroactively to cases on collateral review except in two instances. First:
>
> > "New *substantive* rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms [citations], as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish [citations]. Such rules apply retroactively because they 'necessarily carry a significant risk that a defendant stands convicted of "an act that the law does not make criminal"' or faces a punishment that the law cannot impose upon him." (Emphasis in original.) *Schriro*, 542 U.S. at 351–52, 124 S.Ct. 2519 (and cases cited therein).
>
> Second:
> > "New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." (Internal quotation marks omitted.) *Id*. at 352, 124 S.Ct. 2519.

*People v. Davis*, 6 N.E.3d 709, 721 (Ill. 2014).

[¶49] Broken down, we view the *Teague* analysis as requiring an answer to three questions. The first question is whether the rule at issue is a "new rule." This is a

threshold question because if a case announces a rule that is not considered to be new, that rule will be applied both on direct and collateral review without further analysis, whereas a new rule will apply on collateral review only if the rule meets the *Teague* criteria . *See Whorton v. Bockting*, 549 U.S. 406, 416, 127 S.Ct. 1173, 167 L.Ed.2d 1 (2007) ("Under the *Teague* framework, an old rule applies both on direct and collateral review, but a new rule is generally applicable only to cases that are still on direct review"). The second question under the *Teague* analysis is whether the new rule is substantive or procedural. The third question is whether the rule, if it is determined to be procedural, is a watershed rule.

## 1. *Miller* as New Constitutional Rule

[¶50] The Supreme Court in *Teague* defined what constitutes a new rule, acknowledging that making that determination can sometimes be difficult:

> It is admittedly often difficult to determine when a case announces a new rule, and we do not attempt to define the spectrum of what may or may not constitute a new rule for retroactivity purposes. In general, however, a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. … To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Teague*, 489 U.S. at 301, 109 S.Ct. at 1070 (citations omitted).

[¶51] In the case of *Miller*, this first question is not a difficult one to answer. The parties do not dispute that *Miller* prescribed a new rule, and we have found no decision addressing the retroactivity of *Miller* that concluded otherwise. As one court explained:

> Not only did *Graham* and *Roper* not dictate the result announced in *Miller*, but the Supreme Court proceeded to analyze its jurisprudence in the context of evolving science pertaining to the development of the adolescent brain, which can have an impact on juvenile behavior in myriad ways. *See Miller*, 132 S.Ct. at 2464–2465. Given the distinctive attributes of youth, the Court also recognized the relevance of a wholly separate line of precedents, those requiring individualized assessment prior to the imposition of the death penalty, to which a sentence of life without parole when imposed on a juvenile was analogized. *Id*. at 2466–2467. The convergence of these distinct considerations resulted in the

25

Supreme Court's decision in *Miller*. In our view, *Miller* broke new ground and did not merely apply an established constitutional standard to a novel set of facts.

*Diatchenko*, 1 N.E.3d at 279 (some citations omitted); *see also Mantich*, 842 N.W.2d at 724 ("It is very clear that *Miller* announced a new rule."); *Chambers v. State*, 831 N.W.2d 311, 326 (Minn. 2013) (holding *Miller* announced new rule and citing cases reaching same conclusion).

[¶52] Because we answer the first question in the affirmative and hold that *Miller* announces a new constitutional rule, we turn to the second question of whether the *Miller* rule is procedural or substantive.

## 2.    *Miller* **Rule as Substantive or Procedural**

[¶53] The Supreme Court has defined the characteristics of substantive and procedural rules. "A rule is substantive rather than procedural if it alters the range of conduct or the class of persons that the law punishes." *Schriro*, 542 U.S. at 353, 124 S.Ct. at 2523 (citing *Bousley v. United States*, 523 U.S. 614, 620–21, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)). Thus, a rule that "modifies the elements of an offense is normally substantive rather than procedural." *Schriro*, 542 U.S. at 354, 124 S.Ct. at 2524. A rule that prohibits "a certain category of punishment for a class of defendants because of their status or offense" is also substantive. *Penry v. Lynaugh*, 492 U.S. 302, 330, 109 S.Ct. 2934, 2953, 106 L.Ed.2d 256 (1989), abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Court explained its rule regarding punishment:

> [T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.

*Penry*, 492 U.S. at 330, 109 S.Ct. at 2953.

[¶54] In contrast to substantive rules, the Court has described procedural rules as those "that regulate only the *manner of determining* the defendant's culpability." *Schriro*, 542 U.S. at 353, 124 S.Ct. at 2523. Rules that allocate decision-making authority between a

26

judge and jury, such as in the consideration of mitigating and aggravating circumstances in the imposition of the death penalty, are "prototypical procedural rules." *Id*.

[¶55] The question whether *Miller* announces a substantive or a procedural rule is not one that has been easily answered. As other courts have observed, categorizing the *Miller* holding as substantive or procedural is difficult because the holding has aspects of both. *See Mantich*, 842 N.W.2d at 729 (*Miller* holding "does not neatly fall into the existing definitions of either a procedural rule or a substantive rule"); *Ex Parte Maxwell*, 424 S.W.3d 66, 75 (Tx. Crim. App. 2014) ("Courts are split on the retroactivity question because it is a close call[.]"). The Texas court in *Maxwell* outlined a general description of the competing arguments on the categorization of the *Miller* rule as procedural or substantive:

> Those courts holding that *Miller* is not retroactive strictly construe that first *Teague* exception—a new substantive rule of law—to apply only when the new rule entirely removes a particular punishment from the list of punishments that may be constitutionally imposed on a class of defendants, not when a rule addresses the considerations for determining a particular sentence. These courts conclude that *Miller* does not satisfy the test for retroactivity because it does not categorically bar all sentences of life without parole for juveniles; *Miller* bars only those sentences made mandatory by an explicit sentencing scheme. It changed the permissible method—the procedure—by which the State could exercise its continuing power to punish juvenile homicide offenders by life without parole. …

> Conversely, those courts holding that *Miller* is retroactive have reasoned that it announced a substantive rule that prevents a "significant risk that a juvenile faces a punishment that the law cannot impose on him." They point to the Supreme Court's explanation of a "new substantive rule" in *Schriro v. Summerlin*: New substantive rules include "constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish." *Miller* places juveniles subject to mandatory "life without parole" statutes beyond the State's power to punish. It alters the range of outcomes of a criminal proceeding by prohibiting a mandatory sentence of life without parole for a juvenile murderer. *Miller* is categorical because it completely removes a particular punishment from the list of punishments

27

that can be constitutionally imposed, that of mandatory life without parole.

*Maxwell*, 424 S.W.3d at 72-74 (footnotes omitted).

[¶56] We agree that the *Miller* holding certainly has a procedural component in that it mandates a particular process before sentencing a juvenile offender to life imprisonment without parole. We are more persuaded, however, by the analyses of those courts that have concluded that the rule announced in *Miller* is, despite its procedural aspects, a substantive rule. *See People v. Davis*, 6 N.E.3d 709, 722 (Ill. 2014); *Mantich*, 842 N.W.2d at 731; *Maxwell*, 424 S.W.3d at 75; *Diatchenko*, 1 N.E.3d at 281; *State v. Ragland*, 836 N.W.2d 107, 117 (Iowa 2013); *Jones v. State*, 122 So.3d 698, 702 (Miss. 2013); *Tulloch v. Gerry*, 2013 WL 4011621 *6 (N.H. Super. 2013).

[¶57] We find particularly persuasive the observations of these courts that the *Miller* holding has effected a substantive change in the sentencing statutes applicable to juvenile offenders. As the Illinois court explained:

> While *Miller* does not forbid a sentence of life imprisonment without parole for a minor, it does require Illinois courts to hold a sentencing hearing for every minor convicted of first degree murder at which a sentence other than [life imprisonment without parole] must be available for consideration. *Miller* mandates a sentencing range broader than that provided by statute for minors convicted of first degree murder who could otherwise receive only natural life imprisonment.

*Davis*, 6 N.E.3d at 722; *see also Mantich*, 842 N.W.2d at 731 (requirement that Nebraska change substantive punishment for the crime of first degree murder from mandatory sentence of life without parole to sentence of 40 years to life demonstrates *Miller* rule is substantive); *Jones*, 122 So.3d at 702 (*Miller* rendered sentencing scheme unconstitutional as applied to juvenile offenders and thus modified substantive Mississippi law); *Tulloch*, 2013 WL 4011621 *6 ("*Miller* rule is substantive because it alters the range of outcomes of a criminal proceeding — or the punishments that may be imposed on juvenile homicide offenders").

[¶58] The Nebraska Supreme Court elaborated on the substantive nature of the *Miller* rule:

> And *Miller* itself recognized that when mitigating evidence is considered, a sentence of life imprisonment without parole for a juvenile should be rare. This is

consistent with the underlying logic of *Miller,* based on *Graham*, that "'[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" In essence, *Miller* "amounts to something close to a de facto substantive holding," because it sets forth the general rule that life imprisonment without parole should not be imposed upon a juvenile except in the rarest of cases where that juvenile cannot be distinguished from an adult based on diminished capacity or culpability.

*Mantich*, 842 N.W.2d at 730 (footnotes omitted).

[¶59]  We recognize, as the State argues and as a number of courts have concluded, that *Miller* does not impose a categorical bar against imposing the sentence of life without parole on juvenile homicide offenders.  *See, e.g.*, *Chambers*, 831 N.W. 2d at 328; *Commonwealth v. Cunningham*, 81 A.3d 1, 10 (Pa. 2013); *State v. Tate*, 130 So.3d 829, 837 (La. 2013); *In re Morgan*, 713 F.3d 1365, 1368 (11th Cir. 2013).  The *Miller* holding does however ban a sentence of mandatory life without parole and it substantively changes the conditions under which a sentence of life without parole may be imposed. We agree with the observations of the Iowa Supreme Court, citing Dean Erwin Chemerinsky:

> There is a strong argument that *Miller* should apply retroactively: It says that it is beyond the authority of the criminal law to impose a mandatory sentence of life without parole.  It would be terribly unfair to have individuals imprisoned for life without any chance of parole based on the accident of the timing of the trial.
>
> ....
>
> ... [T]he *Miller* Court did more than change procedures; it held that the government cannot constitutionally impose a punishment. As a substantive change in the law which puts matters outside the scope of the government's power, the holding should apply retroactively.

*Ragland*, 836 N.W.2d at 117 (quoting Erwin Chemerinsky, *Chemerinsky: Juvenile Life-Without-Parole Case Means Courts Must Look at Mandatory Sentences,* A.B.A. J. Law News Now).

[¶60]  We find our conclusion that *Miller* announced a substantive rule to be confirmed by the Supreme Court's resolution of *Miller's* companion case, *Jackson v. Hobbs*. Jackson was before the Supreme Court on state collateral review, and, notwithstanding the finality of the judgment against Jackson, the Court retroactively applied *Miller* and vacated Jackson's sentence.  *Miller*, 67 U.S. at ___, 132 S.Ct. at 2475.  In *Teague*, the Supreme Court held that "once a new rule is applied to the defendant in the case announcing the rule, evenhanded justice requires that it be applied retroactively to all who are similarly situated."  *Teague*, 489 U.S. at 300, 109 S.Ct. at 1070.  That the Supreme Court applied the *Miller* rule to Jackson on collateral review suggests that the Court viewed the rule as a substantive rule that should be applied retroactively to all those situated similarly to Jackson—that is, those challenging their sentences on collateral review.  *See Davis*, 6 N.E.3d at 722; *Mantich*, 842 N.W.2d at 731; *Diatchenko*, 1 N.E.3d at 281-82; *Ragland*, 836 N.W.2d at 116.

[¶61]  Because we have concluded that *Miller* announced a substantive rule, we need not address the third question under the *Teague* analysis—that is, whether the *Miller* rule is a watershed procedural rule.  Having concluded that *Miller* announced a substantive rule, we hold in answer to the second certified question that *Miller* applies retroactively to cases on collateral review.

## CONCLUSION

[¶62]  Mr. Mares' sentence of life without the possibility of parole has been converted by operation of the amended parole statutes to a sentence of life with the possibility of parole in twenty-five years.

[¶63]  In answer to the certified questions, we hold that 1) the proper rule for Wyoming courts to use when considering whether a new constitutional rule applies retroactively to cases on collateral review is the *Teague* analysis; and 2) the rule announced in *Miller* applies retroactively to cases on collateral review.