******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JASON CASIANO *v.* COMMISSIONER OF
CORRECTION
(SC 19345)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued September 16, 2014—officially released May 26, 2015\**

*Heather Golias*, assigned counsel, for the appellant
(petitioner).

*Robin S. Schwartz*, assistant state's attorney, with
whom, on the brief, were *Michael Dearington*, state's
attorney, and *Adrienne Maciulewski*, deputy assistant
state's attorney, for the appellee (respondent).

*Opinion*

McDONALD, J. We recently held in *State* v. *Riley*, 315 Conn. 637, 659, A.3d (2015), that, to comport with the eighth amendment to the federal constitution, the trial court must give mitigating weight to the youth related factors set forth in *Miller* v. *Alabama*, U.S. , 132 S. Ct. 2455, 2464–65, 2468, 183 L. Ed. 2d 407 (2012), when considering whether to impose a life sentence without the possibility of parole on a juvenile homicide offender. In *Riley*, the defendant challenged on direct appeal a total effective sentence of 100 years with no possibility of parole before his natural life expired, a sentence that the state conceded was the functional equivalent to life without parole. *State* v. *Riley*, supra, 642. The different procedural posture and sentence in the present case raises two significant issues regarding the reach of *Miller*: whether *Miller* applies retroactively under Connecticut law to cases arising on collateral review, and, if so, whether *Miller* applies to the imposition of a fifty year sentence on a juvenile offender. We answer both questions in the affirmative[1] and, therefore, reverse the habeas court's decision rendering summary judgment in favor of the respondent, the Commissioner of Correction, on the petition for a writ of habeas corpus filed by the petitioner, Jason Casiano.

This case arises in the context of the following undisputed facts. In 1995, the petitioner, then sixteen years old, and two accomplices attempted to rob a Subway sandwich shop. When the store employee failed to promptly comply with a demand for money, the petitioner shot him four times, resulting in his death. The petitioner and his accomplices fled the scene without completing the robbery. The petitioner was arrested and charged with felony murder in violation of General Statutes § 53a-54c, attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49 and 53a-134 (a) (2), and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2). The state also sought an enhanced penalty for the use of a firearm during the commission of these offenses in violation of General Statutes § 53-202k. For these crimes, the petitioner faced a potential total effective sentence of between twenty-five and 105 years imprisonment.

The petitioner entered a plea of nolo contendere to the three substantive charges pursuant to a court indicated plea agreement, conditioned on his right to appeal the trial court's denial of his motion to suppress incriminating statements he made to the police. In accordance with the plea agreement, the trial court sentenced the petitioner to a total effective prison term of fifty years: fifty years on the felony murder count, and separate twenty year sentences on the counts of attempt to commit robbery in the first degree and conspiracy to commit

robbery in the first degree, to run concurrent to the felony murder sentence. The petitioner is not eligible for parole on the felony murder conviction. See General Statutes § 54-125a (b) (1) (C). The Appellate Court upheld the petitioner's conviction on appeal; *State* v. *Casiano*, 55 Conn. App. 582, 591, 740 A.2d 435 (1999); and this court denied certification to appeal that decision. *State* v. *Casiano*, 252 Conn. 942, 747 A.2d 518 (2000).[2]

After the petitioner's conviction and sentence became final, the United States Supreme Court decided a trilogy of cases that altered the landscape of juvenile sentencing practices. The court held that, under the eighth amendment to the federal constitution, "children are constitutionally different from adults for purposes of sentencing"; *Miller* v. *Alabama*, supra, 132 S. Ct. 2464; and, therefore, that they cannot be sentenced in certain circumstances as if they are adults. See *Roper* v. *Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) (eighth and fourteenth amendments prohibit imposition of death penalty on offenders who were under age of eighteen when their crimes were committed); *Graham* v. *Florida*, 560 U.S. 48, 82, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) (eighth amendment prohibits sentence of life without possibility of parole for juvenile nonhomicide offender); *Miller* v. *Alabama*, supra, 2463–64 (eighth amendment prohibits sentencing scheme that mandates life in prison without possibility of parole for juvenile homicide offender, thereby precluding sentencing authority from considering offender's age and hallmarks of adolescence).

In light of these legal developments, the petitioner filed a petition for a writ of habeas corpus, arguing that General Statutes §§ 53a-35a (2) and 54-125a (b), the authority under which his fifty year prison term with no possibility of parole was imposed, violate the eighth amendment as applied to him. He requested that his sentence be vacated and his case remanded to the trial court for further proceedings. The respondent filed a motion for summary judgment, arguing, inter alia, that the petitioner's claims were controlled by the Appellate Court's decision in *State* v. *Riley*, 140 Conn. App. 1, 14–19, 58 A.3d 304 (2013), which held that Connecticut sentencing practices that permit the trial court to impose a lesser sentence than life imprisonment without parole and to consider any mitigating evidence offered are constitutional under *Miller*.[3] The habeas court agreed and granted the respondent's motion.

Following this court's decision granting certification to appeal in *State* v. *Riley*, 308 Conn. 910, 61 A.3d 531 (2013), the petitioner appealed from the habeas court's judgment to the Appellate Court, and we transferred the appeal to this court. In his appeal, the petitioner argues that *Miller* requires a trial court to consider the characteristics of youth as mitigating evidence in

determining whether a sentence of life without parole is appropriate.[4] He argues that his sentence of fifty years imprisonment without the opportunity for parole is the functional equivalent of a life sentence and therefore must comport with the requirements set forth in *Miller*. The respondent counters that *Miller* does not apply retroactively to cases on collateral review.[5] The respondent further contends that, even if it does apply, the petitioner cannot avail himself of the individual sentencing procedure under *Miller* because his fifty year sentence is not a life sentence, nor was it imposed pursuant to a mandatory sentencing scheme. We conclude that *Miller* applies retroactively under Connecticut law to the petitioner's case.

I

In *Riley*, we provided an overview of the Supreme Court's reasoning in *Roper*, *Graham*, and *Miller*. *State v. Riley*, supra, 315 Conn. 645–53. Therefore, we limit our discussion of that court's juvenile sentencing cases to the aspects of those cases that are particularly relevant to the questions in the present case. Although *Miller* is our principal focus, we also address *Graham* insofar as that decision sheds light on the substantive question before us.

The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." The United States Supreme Court has recognized that the eighth amendment contains a proportionality principle, that is, that "punishment for crime should be graduated and proportioned to both the offender and the offense." (Internal quotation marks omitted.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2463.

In *Graham*, the court adopted a categorical rule, concluding that the eighth amendment bars a sentence of life without parole for juvenile nonhomicide offenders. *Graham* v. *Florida*, supra, 560 U.S. 82. Similarities between the death penalty—which *Roper* had barred for juvenile offenders—and life without parole—" 'the second most severe penalty permitted by law' "; id., 69; played a significant role in the court's basis for its holding in *Graham*. See *Miller* v. *Alabama*, supra, 132 S. Ct. 2463 (court in *Graham* "likened life without parole for juveniles to the death penalty"). The court in *Graham* explained that life without parole "is irrevocable. It deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence. . . . [T]his sentence means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." (Citation omitted; internal

quotation marks omitted.) *Graham* v. *Florida*, supra, 69–70.

In *Miller*, the court held that, before a sentence of life without the possibility of parole may be imposed on a juvenile homicide offender, a sentencing authority must engage in an individualized sentencing process that accounts for the mitigating circumstances of youth and its attendant characteristics. *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. Relying on its prior decisions in *Roper* and *Graham*, which both cited science and social science as support for their conclusions, the court noted that studies show that "[o]nly a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. [*Roper* v. *Simmons*, supra, 543 U.S. 570] . . . . [D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control. [*Graham* v. *Florida*, supra, 560 U.S. 68]. . . . [T]hose findings—of transient rashness, proclivity for risk, and inability to assess consequences—both [lessen] a child's moral culpability and [enhance] the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." (Footnote omitted; internal quotation marks omitted.) *Miller* v. *Alabama*, supra, 2464–65.

Accordingly, the court in *Miller* reasoned that, before "irrevocably sentencing [a juvenile offender] to a lifetime in prison," a sentencing authority must "take into account how children are different, and how those differences counsel against irrevocably sentencing [a juvenile offender] to a lifetime in prison." Id., 2469. The court identified those salient factors as including, in addition to the offender's age at the time of the crime: "immaturity, impetuosity, and failure to appreciate risks and consequences"; the offender's "family and home environment" and the offender's inability to extricate himself from that environment; "the circumstances of the homicide offense, including the extent of [the offender's] participation in the conduct and the way familial and peer pressures may have affected him"; the offender's "inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys"; and "the possibility of rehabilitation . . . ." Id., 2468; see also *State* v. *Riley*, supra, 315 Conn. 658. A mandatory sentencing scheme, however, renders these factors irrelevant: "By removing youth from the balance—by subjecting a juvenile to the same life-without-parole sentence applicable to an adult—these [sentencing] laws prohibit a sentencing authority from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Miller* v. *Alabama*, supra, 2466.

In *Riley*, we recognized that, although "*Miller* is replete with references to 'mandatory' life without

parole and like terms"; *State* v. *Riley*, supra, 315 Conn. 653; its reasoning extends beyond mandatory sentencing schemes. Id., 654. We held that "if a sentencing scheme permits the imposition of [a life sentence without any possibility of parole] on a juvenile homicide offender, the trial court *must* consider the offender's 'chronological age and its hallmark features' as mitigating against such a severe sentence." (Emphasis in original.) Id., 658. The individualized sentencing requirement in *Miller*, in other words, "establish[ed] . . . a presumption against imposing a life sentence without parole on a juvenile offender that must be overcome by evidence of unusual circumstances." Id., 655. With this background in mind, we consider whether *Miller* also must be applied to cases arising on collateral review, and whether a fifty year sentence falls within *Miller*'s individualized sentencing mandate.

## II

In *Miller*, the court was not faced with, and therefore did not consider, the question of whether its holding must apply retroactively to cases on collateral review.[6] We conclude that the rule announced in *Miller* is a watershed rule of criminal procedure that must be applied retroactively.

Our starting point for determining whether *Miller* applies retroactively is the framework set forth in *Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). See *Thiersaint* v. *Commissioner of Correction*, 316 Conn. 89, 112,     A.3d     (2015) (adopting *Teague* framework). Under *Teague*, the court "must [first] ascertain the legal landscape" as it existed at the time the petitioner's conviction became final and "ask whether the [United States] [c]onstitution, as interpreted by the precedent then existing, compels the rule . . . . That is, the court must decide whether the rule is actually new." (Citation omitted; internal quotation marks omitted.) *Beard* v. *Banks*, 542 U.S. 406, 411, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004). A constitutional rule is "new" for purposes of *Teague* "if the result was not dictated by precedent existing at the time the defendant's conviction became final." (Internal quotation marks omitted.) *Thiersaint* v. *Commissioner of Correction*, supra, 103.

With two exceptions, a new rule will not apply retroactively to cases on collateral review. *Teague* v. *Lane*, supra, 489 U.S. 311–13. First, if the new rule is "substantive," that is, if the rule "places certain kinds of primary, private conduct beyond the power of the criminal lawmaking authority to proscribe"; (internal quotation marks omitted) *Thiersaint* v. *Commissioner of Correction*, supra, 316 Conn. 108 n.8; it must apply retroactively. "Such rules apply retroactively because they necessarily carry a significant risk that a defendant stands convicted of an act that the law does not make criminal or faces a punishment that the law cannot

impose upon him." (Internal quotation marks omitted.) *Schriro* v. *Summerlin*, 542 U.S. 348, 352, 124 S. Ct. 2519, 159 L. Ed. 2d 442 (2004).

Second, if the new rule is procedural, it applies retroactively if it is "a watershed [rule] of criminal procedure . . . implicit in the concept of ordered liberty"; (citation omitted; internal quotation marks omitted) *Beard* v. *Banks*, supra, 542 U.S. 417; meaning that it "implicat[es] the fundamental fairness and accuracy of [a] criminal proceeding." (Internal quotation marks omitted.) Id.; see also *Sawyer* v. *Smith*, 497 U.S. 227, 242, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990) (rule is watershed when it improves accuracy and "alter[s] our understanding of the bedrock procedural elements essential to the fairness of a proceeding" [emphasis omitted; internal quotation marks omitted]), quoting *Teague* v. *Lane*, supra, 489 U.S. 311. Watershed rules of criminal procedure include those that "raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise." *Schriro* v. *Summerlin*, supra, 542 U.S. 352. The United States Supreme Court has narrowly construed this second exception and, in the twenty-five years since *Teague* was decided, has yet to conclude that a new rule qualifies as watershed. See id. (class of watershed rules of criminal procedure "is extremely narrow, and it is unlikely that any . . . ha[s] yet to emerge" [internal quotation marks omitted]); *State* v. *Mares*, 335 P.3d 487, 502 (Wyo. 2014) ("[t]he [United States] Supreme Court has found no watershed rules . . . since it adopted *Teague*" [internal quotation marks omitted]).

We note that, although this court concluded that we will apply the *Teague* framework, we did so "with the caveat that, while federal decisions applying *Teague* may be instructive, this court will not be bound by those decisions in any particular case, but will conduct an independent analysis and application of *Teague*." *Thiersaint* v. *Commissioner of Correction*, supra, 316 Conn. 113; see also *Danforth* v. *Minnesota*, 552 U.S. 264, 280–81, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008) ("[T]he *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own [s]tate's convictions."). We therefore remain free to "apply the *Teague* analysis more liberally than the United States Supreme Court would otherwise apply it where a particular state interest is better served by a broader retroactivity ruling." *State* v. *Mares*, supra, 335 P.3d 504; see also *Rhoades* v. *State*, 149 Idaho 130, 139, 233 P.3d 61 (2010) (because comity concerns do not apply to state court's review of state's convictions, Idaho courts are "not required to blindly follow [the United States

Supreme Court's] view of . . . whether a new rule is a watershed rule"), cert. denied, U.S. , 131 S. Ct. 1571, 179 L. Ed. 2d 477 (2011).

Every court that has considered whether *Miller* applies retroactively to cases on collateral review under *Teague* has concluded that *Miller* announced a new rule. See, e.g., *State* v. *Mares*, supra, 335 P.3d 505 ("we have found no decision addressing the retroactivity of *Miller* that concluded [that *Miller* did not announce a new rule]").[7] There is a split of authority, however, as to whether *Miller* satisfies either of *Teague*'s exceptions.[8] Many courts have recognized that it is difficult to categorize *Miller* as either substantive or procedural, as its holding has characteristics of both types of rules. *State* v. *Mantich*, 287 Neb. 320, 339, 842 N.W.2d 716 ("how the rule announced in *Miller* should be categorized is difficult, because it does not neatly fall into the existing definitions of either a procedural rule or a substantive rule"), cert. denied, U.S. , 135 S. Ct. 67, 190 L. Ed. 2d 229 (2014); *State* v. *Mares*, supra, 506 ("[t]he question whether *Miller* announces a substantive or a procedural rule is not one that has been easily answered . . . because the holding has aspects of both"). Indeed, the holding in *Miller* was predicated on the "confluence" of two strands of the court's proportionality jurisprudence; *Miller* v. *Alabama*, supra, 132 S. Ct. 2464; one strand applying categorical bars, which must apply retroactively,[9] and the other strand concerning individualized sentencing determinations, which may not apply retroactively.[10] Id., 2463.

Acknowledging the Supreme Court's narrow view of *Teague*'s second exception, those courts that have held that *Miller* applies retroactively have relied on *Teague*'s first exception. These courts have determined that *Miller* announced a new substantive rule in that it held unconstitutional the *mandatory* imposition of a sentence of life without parole on a class of offenders. See, e.g., *State* v. *Ragland*, 836 N.W.2d 107, 117 (Iowa 2013); *State* v. *Mantich*, supra, 287 Neb. 340–41; *State* v. *Mares*, supra, 335 P.3d 508. Notably, these courts have recognized that the rule in *Miller* has a procedural component to it and that it would be " 'terribly unfair' " to refrain from applying *Miller* retroactively, but nonetheless characterized the case as announcing a substantive rule, rather than a watershed procedural rule. *State* v. *Ragland*, supra, 117; *State* v. *Mantich*, supra, 342; *State* v. *Mares*, supra, 508.

We agree with every other court that has considered the issue that *Miller* created a "new rule." See footnote 7 of this opinion. When the petitioner's conviction became final in 2000, existing precedent did not compel the conclusion that it was unconstitutional to impose a life sentence without the possibility of parole on a juvenile offender. Indeed, the cases on which the court relied in *Miller*—*Roper* and *Graham*—were decided

several years after the petitioner's conviction became final. See *Thiersaint* v. *Commissioner of Correction*, supra, 316 Conn. 103 ("a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final" [internal quotation marks omitted]); *Diatchenko* v. *District Attorney*, 466 Mass. 655, 662, 1 N.E.3d 270 (2013) (cases decided before *Miller* "suggested the opposite result from the one ultimately reached in *Miller*"); *Chambers* v. *State*, 831 N.W.2d 311, 325 (Minn. 2013) ("when [the petitioner's] conviction became final in 1999, *Roper* and *Graham* had not been decided yet and *Miller* was certainly not 'dictated by precedent' ").

We also agree that it is difficult to categorize *Miller* squarely in one of *Teague*'s exceptions or the other. Nonetheless, we conclude that the rule in *Miller* requiring that a sentencing authority conduct an individualized sentencing procedure and consider the mitigating circumstances of youth before sentencing a juvenile offender to a life sentence without parole is more properly characterized as a procedural, rather than a substantive, rule. "[R]ules that regulate only the manner of determining the defendant's culpability are procedural." (Emphasis omitted.) *Schriro* v. *Summerlin*, supra, 542 U.S. 353. "[A] rule that alters the manner of determining culpability merely raise[s] the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. . . . Applying this understanding to new rules governing sentences and punishments, a new procedural rule creates the possibility that the defendant would have received a less severe punishment but does not necessitate such a result. Accordingly, a rule is procedural when it affects how and under what framework a punishment may be imposed but leaves intact the state's fundamental legal authority to seek the imposition of the punishment on a defendant currently subject to the punishment." (Citation omitted; internal quotation marks omitted.) *People* v. *Carp*, 496 Mich. 440, 481, 852 N.W.2d 801 (2014).

The court in *Miller* did not eliminate the power of a state to impose a punishment of life imprisonment without the possibility of parole. Rather, it required that a sentencing authority follow a certain process before imposing that sentence. See *In re Morgan*, 713 F.3d 1365, 1368 (11th Cir. 2013); *People* v. *Carp*, supra, 496 Mich. 482; *Chambers* v. *State*, supra, 831 N.W.2d 328. The court in *Miller* itself acknowledged that it was not "categorically bar[ring] a penalty," but instead was requiring only that a "sentencer *follow a certain process*" before imposing that penalty. (Emphasis added.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2471; but see id., 2469 (expressly leaving open question whether punishment must be categorically barred for all, or certain, juvenile offenders). Although *Miller* has a substantive component, in that it only requires this sentencing pro-

cedure for a category of offenders; see footnote 9 of this opinion; the focus in *Miller* on the *process* by which juveniles can be sentenced to life without parole leads us to conclude that, for purposes of *Teague, Miller* announced a procedural rule.

We further conclude that the rule in *Miller* is a watershed rule of criminal procedure for purposes of our court's application of the second exception of *Teague*. A watershed rule of criminal procedure is one that (1) is "implicit in the concept of ordered liberty," and that "alter[s] our understanding of the bedrock procedural elements" essential to a proceeding; (emphasis omitted; internal quotation marks omitted) *Teague* v. *Lane*, supra, 489 U.S. 311; such that a proceeding conducted without the benefit of that rule "implicate[s] . . . fundamental fairness";[11] id., 312; and (2) is "central to an accurate determination of innocence or guilt," such that the rule's absence creates an impermissibly large risk that innocent persons will be convicted. Id., 313; see also *Sawyer* v. *Smith*, supra, 497 U.S. 242. In the sentencing context, where the issue is no longer one of guilt or innocence, the second criterion asks whether the new procedure is central to an accurate determination that the sentence imposed is a proportionate one. See *Schriro* v. *Summerlin*, supra, 542 U.S. 359 (Breyer, J., dissenting).[12]

We conclude that *Miller* satisfies this test. In *Miller*, the court barred a scheme that failed to account for the mitigating circumstances of youth. The court in *Miller* posited that, upon proper consideration of "children's diminished culpability and heightened capacity for change," it would be "uncommon" for a sentencing authority to impose the harsh penalty of a life sentence without parole. *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. Because *Miller*, in effect, set forth a presumption that a juvenile offender would not receive a life sentence without parole upon due consideration of the mitigating factors of youth, the decision acknowledges that the procedures it prescribed would impact the sentence imposed in most cases. See *State* v. *Riley*, supra, 315 Conn. 655 (*Miller* "suggests that the mitigating factors of youth establish . . . a presumption against imposing a life sentence without parole on a juvenile offender that must be overcome by evidence of unusual circumstances"). Thus, the individualized sentencing prescribed by *Miller* is "central to an accurate determination"; *Teague* v. *Lane*, supra, 489 U.S. 313; that the sentence imposed is a proportionate one. See *Saffle* v. *Parks*, 494 U.S. 484, 507, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990) (Brennan, J., dissenting) (four dissenting justices concluded that, because rules ensuring sentencing authority's ability to consider mitigating evidence "are integral to the proper functioning of the capital sentencing hearing, they must apply retroactively under the second *Teague* exception").

Similarly, the court recognized that "making youth (and all that accompanies it) irrelevant" to a sentencing procedure "poses too great a risk of disproportionate punishment." *Miller* v. *Alabama*, supra, 132 S. Ct. 2469. If failing to consider youth and its attendant characteristics creates a risk of disproportionate punishment in violation of the eighth amendment, then the rule in *Miller* assuredly implicates the fundamental fairness of a juvenile sentencing proceeding because it is a "basic precept of justice" that punishment must be proportionate "to both the offender and the offense." (Internal quotation marks omitted.) Id., 2463. The court in *Miller* also "alter[ed] our understanding of the bedrock procedural elements essential to the fairness of a [juvenile sentencing] proceeding"; (emphasis omitted; internal quotation marks omitted) *Sawyer* v. *Smith*, supra, 497 U.S. 242; because the court required that certain factors be considered in an individualized sentencing proceeding before a certain class of offenders may receive a particular punishment. In other words, our understanding of the bedrock procedural element of individualized sentencing was altered when the court intertwined two strands of its eighth amendment jurisprudence to require consideration of new factors for a class of offenders to create a presumption against a particular punishment. As one court aptly noted, albeit in dicta: "[I]f ever there was a legal rule that should—as a matter of law and morality—be given retroactive effect, it is the rule announced in *Miller*. To hold otherwise would allow the state to impose unconstitutional punishment on some persons but not others, an intolerable miscarriage of justice." (Emphasis omitted.) *Hill* v. *Snyder*, Docket No. 10-14568, 2013 WL 364198, *2 (E.D. Mich. January 30, 2013). The individualized sentencing process required by *Miller* must, therefore, apply retroactively on collateral review. In light of this conclusion, we turn to the question of whether the petitioner's sentence in the present case, which was imposed without consideration of the mitigating factors set forth in *Miller*, falls within the ambit of that rule.[13]

III

In *Riley*, we concluded that the holding in *Miller* implicates not only mandatory sentencing schemes, but also discretionary sentencing schemes that permit a life sentence without parole for a juvenile offender but do not mandate consideration of *Miller*'s mitigating factors. *State* v. *Riley*, supra, 315 Conn. 658. This holding disposes of the respondent's argument that *Miller* does not apply to the petitioner's sentence because it was not imposed pursuant to a mandatory sentencing scheme.[14] Our inquiry in the present case, therefore, focuses on whether the imposition of a fifty year sentence without the possibility of parole is subject to the sentencing procedures set forth in *Miller*. We conclude that it is.

Numerous courts have considered whether a sen-

tence for a lengthy term of years should be deemed the functional equivalent of a life sentence subject to the Supreme Court's juvenile sentencing requirements. Some courts have concluded that these requirements only apply to a literal "life" sentence regardless of whether the sentence exceeds the average life expectancy of a juvenile offender.[15] We agree, however, with those courts that have concluded that the Supreme Court's focus in *Graham* and *Miller* "was not on the label of a 'life sentence' " but rather on whether a juvenile would, as a consequence of a lengthy sentence without the possibility of parole, actually be imprisoned for the rest of his life. *Moore* v. *Biter*, 725 F.3d 1184, 1192 (9th Cir. 2013); see also *Thomas* v. *Pennsylvania*, Docket No. CV-10-4537, 2012 WL 6678686, *2 (E.D. Pa. December 21, 2012) ("the Supreme Court's analysis would [not] change simply because a sentence is labeled a term-of-years sentence rather than a life sentence").

Indeed, most courts that have considered the issue agree that a lengthy term of years for a juvenile offender will become a de facto life sentence at some point, although there is no consensus on what that point is.[16] Some courts conclude that only a sentence that would exceed the juvenile offender's natural life expectancy constitutes a life sentence.[17] Others have found that a sentence is properly considered a de facto life sentence if a juvenile offender would not be eligible for release until near the expected end of his life. See, e.g., *People* v. *J.I.A.*, Docket No. G040625, 2013 WL 342653, *5 (Cal. App. January 30, 2013*)* (de facto life sentence when defendant's life expectancy was "anywhere from [sixty-four] to [seventy-six] years" and he was eligible for parole at age seventy, because he had no possibility for release "until about the time he is expected to die"); *State* v. *Null*, 836 N.W.2d 41, 71 (Iowa 2013) (concluding that fifty-two years is effective life sentence even though evidence "does not clearly establish that [the defendant's] prison term is beyond his life expectancy" but rather that it may "closely come within two years of his life expectancy"); *Bear Cloud* v. *State*, 334 P.3d 132, 142 (Wyo. 2014) ("[t]he prospect of [only] geriatric release" is functional equivalent of life without parole [internal quotation marks omitted]).

We, too, reject the notion that, in order for a sentence to be deemed "life imprisonment," it must continue until the literal end of one's life. Indeed, our legislature defines life imprisonment as including a "definite sentence of sixty years . . . ." General Statutes § 53a-35b. The law in Connecticut, therefore, presumes that, at a minimum, a sixty year term of imprisonment is the functional equivalent of a life sentence. The question that remains is whether a sentence for a term of years less than that sixty year threshold also may be deemed a life sentence for purposes of *Miller*.[18]

We begin by observing that recent government statis-

tics indicate that the average life expectancy for a male in the United States is seventy-six years. United States Department of Health and Human Services, Centers for Disease Control and Prevention, National Vital Statistics Reports, Vol. 62, No. 7 (January 6, 2014), available at http://www.cdc.gov/nchs/data/nvsr/nvsr62/ nvsr62_07.pdf (last visited May 26, 2015). This means that an average male juvenile offender imprisoned between the ages of sixteen and eighteen who is sentenced to a fifty year term of imprisonment would be released from prison between the ages of sixty-six and sixty-eight, leaving eight to ten years of life outside of prison. Notably, this general statistic does not account for any reduction in life expectancy due to the impact of spending the vast majority of one's life in prison. See, e.g., Campaign for the Fair Sentencing of Youth, "Michigan Life Expectancy Data for Youth Serving Natural Life Sentences," (2012–2015) p. 2, available at http:// fairsentencingofyouth.org/wp-content/uploads/2010/ 02/Michigan-Life-Expectancy-Data-Youth-Serving-Life.pdf (last visited May 26, 2015) (concluding that Michigan juveniles sentenced to natural life sentences have average life expectancy of 50.6 years); N. Straley, "*Miller*'s Promise: Re-Evaluating Extreme Criminal Sentences for Children," 89 Wn. L. Rev. 963, 986 n.142 (2014) (data from New York suggests that "[a] person suffers a two-year decline in life expectancy for every year locked away in prison"); see also *United States* v. *Taveras*, 436 F. Supp. 2d 493, 500 (E.D.N.Y. 2006) (acknowledging that life expectancy within federal prison is "considerably shortened"), vacated in part on other grounds sub nom. *United States* v. *Pepin*, 514 F.3d 193 (2d Cir. 2008); *State* v. *Null*, supra, 836 N.W.2d 71 (acknowledging that "long-term incarceration [may present] health and safety risks that tend to decrease life expectancy as compared to the general population"). Such evidence suggests that a juvenile offender sentenced to a fifty year term of imprisonment may never experience freedom.

A juvenile offender is typically put behind bars before he has had the chance to exercise the rights and responsibilities of adulthood, such as establishing a career, marrying, raising a family, or voting. Even assuming the juvenile offender does live to be released, after a half century of incarceration, he will have irreparably lost the opportunity to engage meaningfully in many of these activities and will be left with seriously diminished prospects for his quality of life for the few years he has left. A juvenile offender's release when he is in his late sixties comes at an age when the law presumes that he no longer has productive employment prospects. Indeed, the offender will be age-qualified for Social Security benefits without ever having had the opportunity to participate in gainful employment. See 42 U.S.C. § 416 (*l*) (defining " 'retirement age' " under Social Security Act as between ages sixty and sixty-

seven). Any such prospects will also be diminished by the increased risk for certain diseases and disorders that arise with more advanced age, including heart disease, hypertension, stroke, asthma, chronic bronchitis, cancer, diabetes, and arthritis. See Federal Interagency Forum on Aging-Related Statistics, "Older Americans 2012: Key Indicators of Well-Being," (June 2012) pp. xvi, 27, available at http://agingstats.gov/agingstatsdotnet/Main_Site/Data/2012_Documents/Docs/EntireChartbook.pdf (last visited May 26, 2015).

The United States Supreme Court viewed the concept of "life" in *Miller* and *Graham* more broadly than biological survival; it implicitly endorsed the notion that an individual is effectively incarcerated for "life" if he will have no opportunity to truly reenter society or have any meaningful life outside of prison. See *Graham* v. *Florida*, supra, 560 U.S. 75 (states must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" for juvenile nonhomicide offender); see also *People* v. *Perez*, 214 Cal. App. 4th 49, 57, 154 Cal. Rptr. 3d 114 (juvenile sentencing cases are concerned with whether "there is *some meaningful life expectancy left*" when the offender becomes eligible for release [emphasis added]), cert. denied,      U.S.      , 134 S. Ct. 527, 187 L. Ed. 2d 379 (2013). In analogizing a life sentence without parole for a juvenile offender to the death penalty, *Graham* underscored the sense of hopelessness that accompanies such a sentence. See *Graham* v. *Florida*, supra, 69–70 (Life imprisonment without parole "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency— the remote possibility of which does not mitigate the harshness of the sentence. . . . [T]his sentence means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of [the convict], he will remain in prison for the rest of his days." [Citation omitted; internal quotation marks omitted.]). In light of the foregoing statistics and their practical effect, a fifty year term and its grim prospects for any future outside of prison effectively provide a juvenile offender with "no chance for fulfillment outside prison walls, no chance for reconciliation with society, no hope." Id., 79. Thus, we agree with the Iowa Supreme Court that "[e]ven if lesser sentences than life without parole might be less problematic, we do not regard the juvenile's potential future release in his or her late sixties after a half century of incarceration sufficient to escape the rationales of *Graham* or *Miller*." *State* v. *Null*, supra, 836 N.W.2d 71; see also id. (concluding that prospect of "geriatric release" implicates concerns raised in *Graham*).

We need not decide in the present case whether the imposition of a term of less than fifty years imprisonment without parole on a juvenile offender would

require the procedures set forth in *Miller*,[19] or whether other characteristics might bear on a juvenile offender's life expectancy. Indeed, we have every reason to expect that our decisions in *Riley* and in the present case will prompt our legislature to renew earlier efforts to address the implications of the Supreme Court's decisions in *Graham* and *Miller*. See Substitute House Bill No. 5221, 2014 Sess.; Substitute Senate Bill No. 1062, 2013 Sess.; Substitute House Bill No. 6581, 2013 Sess. We are nonetheless persuaded that the procedures set forth in *Miller* must be followed when considering whether to sentence a juvenile offender to fifty years imprisonment without parole. The habeas court, therefore, improperly granted the respondent's motion for summary judgment on the ground that *Miller* does not apply to the petitioner's sentence.

The judgment is reversed and the case is remanded to the habeas court for further proceedings consistent with this opinion.

In this opinion ROGERS, C. J., and PALMER and EVELEIGH, Js., concurred.

* May 26, 2015, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] As we explain later in this opinion, the petitioner has advanced an additional claim that we decline to address at this juncture. See footnote 4 of this opinion.

[2] See *Beard* v. *Banks*, 542 U.S. 406, 411, 124 S. Ct. 2504, 159 L. Ed. 2d 494 (2004) ("[s]tate convictions are final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied" [internal quotation marks omitted]).

[3] In that same filing, the respondent also sought dismissal of the petition on the ground that the petitioner had waived his right to argue that his sentence is disproportionate when he accepted a plea deal. The respondent later withdrew his motion to dismiss.

[4] The petitioner also asserts a separate claim that, under *Graham*, he is entitled to a review of his sentence at some later point in time–a " 'second look' "; *State* v. *Riley*, supra, 140 Conn. App. 22 (*Borden*, *J.*, dissenting); at which he should have the opportunity to obtain release based on demonstrated maturity and rehabilitation. Consistent with our approach in *Riley*, which we explained in further detail in that decision, we decline to address this claim. Because we conclude that *Miller* applies to the petitioner's sentence, he may, at a later proceeding, receive a sentence that cannot reasonably be characterized as the functional equivalent of life without parole, which is the factual predicate for his *Graham* claim. In addition, as we explained in *Riley*, our legislature has taken steps to consider wholesale changes to the availability of parole for juvenile offenders, a matter that is delegated to that body. *State* v. *Riley*, supra, 315 Conn. 662. Therefore, concerns of deference to a coordinate branch of government and ripeness counsel against reaching this issue.

[5] We reject the petitioner's contention that we should not consider the issue of retroactivity because the respondent failed to raise it as a defense before the habeas court. It is appropriate for this court to consider the issue of retroactivity because the respondent undoubtedly will raise it following our remand. See *State* v. *Tabone*, 292 Conn. 417, 431, 973 A.2d 74 (2009) (addressing issue likely to arise on remand). Moreover, as we explained in *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 128, 84 A.3d 840 (2014), a reviewing court has discretion to consider an unpreserved claim if "exceptional circumstances exist that would justify review of such an issue if raised by a party . . . the parties are given an opportunity to be heard on the issue, and . . . there is no unfair prejudice to the party against whom the issue is to be decided." The petitioner had the opportunity to address the issue of retroactivity in his reply brief and at oral argument.

[6] We recognize that several courts that have concluded that *Miller* applies retroactively relied on the fact that relief also was afforded to the petitioner in *Jackson* v. *Hobbs*, an appeal that arose on collateral review and was heard and decided together with *Miller. Miller* v. *Alabama*, supra, 132 S. Ct. 2461–62, 2475; see, e.g., *People* v. *Davis*, 6 N.E.3d 709, 722 (Ill.), cert. denied, U.S. , 135 S. Ct. 710, 190 L. Ed. 2d 439 (2014); *State* v. *Ragland*, 836 N.W.2d 107, 116 (Iowa 2013); *Diatchenko* v. *District Attorney*, 466 Mass. 655, 666, 1 N.E.3d 270 (2013); *Jones* v. *State*, 122 So. 3d 698, 703 n.5 (Miss. 2013); *Petition of State*, Docket No. 2013-566, 2014 WL 4253359, *4 (N.H. August 29, 2014); *Aiken* v. *Byars*, Docket No. 27465, 2014 WL 5836918, *2 (S.C. November 12, 2014). We do not believe this fact settles the issue. The question of retroactivity was not squarely before the court in *Miller* and its holding did not require the petitioner in *Jackson* to be resentenced in light of its opinion; it only remanded the case "for further proceedings not inconsistent with this opinion." *Miller* v. *Alabama*, supra, 2475.

[7] See also *In re Morgan*, 713 F.3d 1365, 1366 (11th Cir. 2013); *Craig* v. *Cain*, Docket No. 12-30035, 2013 WL 69128, *1 (5th Cir. January 4, 2013); *Williams* v. *State*, Docket No. CR12-1862, 2014 WL 1392828, *4 (Ala. Crim. App. April 4, 2014); *People* v. *Davis*, 6 N.E.3d 709, 722 (Ill.), cert. denied, U.S. , 135 S. Ct. 710, 190 L. Ed. 2d 439 (2014); *State* v. *Ragland*, 836 N.W.2d 107, 114–17 (Iowa 2013); *Diatchenko* v. *District Attorney*, 466 Mass. 655, 662, 1 N.E.3d 270 (2013); *People* v. *Carp*, 298 Mich. App. 472, 510, 828 N.W.2d 685 (2012), aff'd, 496 Mich. 440, 852 N.W.2d 801 (2014); *Chambers* v. *State*, 831 N.W.2d 311, 325–26 (Minn. 2013); *State* v. *Mantich*, 287 Neb. 320, 331, 842 N.W.2d 716, cert. denied, U.S. , 135 S. Ct. 67, 190 L. Ed. 2d 229 (2014); *Petition of State*, Docket No. 2013-566, 2014 WL 4253359, *3 (N.H. August 29, 2014); *Aiken* v. *Byars*, Docket No. 27465, 2014 WL 5836918, *2 (S.C. November 12, 2014); *Ex parte Maxwell*, 424 S.W.3d 66, 75 (Tex. Crim. App. 2014).

[8] Compare *In re Willover*, 235 Cal. App. 4th 1328, 1342, 186 Cal. Rptr. 3d 146 (*Miller* is retroactive as substantive rule), modified, 2015 Cal. App. LEXIS 345 (2015), *Falcon* v. *State*, Docket No. SC13-865, 2015 WL 1239365, *6, 8 (Fla. March 19, 2015) (*Miller* is retroactive under Florida's three part test for retroactivity which considers " '[a] the purpose to be served by the new rule; [b] the extent of reliance on the old rule; and [c] the effect on the administration of justice of a retroactive application of the new rule,' " but noting that court would "reach the same conclusion . . . if [the court] were to apply the test [for retroactivity] established in *Teague*"), *People* v. *Davis*, 6 N.E.3d 709, 722 (Ill.) (*Miller* is retroactive as substantive rule), cert. denied, U.S. , 135 S. Ct. 710, 190 L. Ed. 2d 229 (2014), *State* v. *Ragland*, 836 N.W.2d 107, 117 (Iowa 2013) (same), *Diatchenko* v. *District Attorney*, 466 Mass. 655, 666, 1 N.E.3d 270 (2013) (same), *Jones* v. *State*, 122 So. 3d 698, 703 (Miss. 2013) (same), *State* v. *Mantich*, 287 Neb. 320, 342, 842 N.W.2d 716, cert. denied, U.S. , 135 S. Ct. 67, 190 L. Ed. 2d 229 (2014) (same), *Petition of State*, Docket No. 2013-566, 2014 WL 4253359, *4 (N.H. August 29, 2014) (same), *Aiken* v. *Byars*, Docket No. 27465, 2014 WL 5836918, *2 (S.C. November 12, 2014) (same), *Ex parte Maxwell*, 424 S.W.3d 66, 75 (Tex. Crim. App. 2014) (same), *State* v. *Mares*, supra, 335 P.3d 508 (same), and *Hill* v. *Snyder*, Docket No. 10-14568, 2013 WL 364198, *2 n.2 (E.D. Mich. January 30, 2013) (same), with *In re Morgan*, 713 F.3d 1365, 1368 (11th Cir. 2013) (*Miller* not retroactive because it is procedural rule that is not watershed), *Ex parte Williams*, Docket No. 1131160, 2015 WL 1388138, *13 (Ala. March 27, 2015) (same), *People* v. *Carp*, 496 Mich. 440, 495, 852 N.W.2d 801 (2012) (same), *Chambers* v. *State*, 831 N.W.2d 311, 331 (Minn. 2013) (same), *Commonwealth* v. *Cunningham*, 622 Pa. 543, 552, 81 A.3d 1 (2013) (same), cert. denied, U.S. , 134 S. Ct. 2724, 189 L. Ed. 2d 763 (2014), and *Malvo* v. *Mathena*, Docket No. 2:13-CV-375, 2014 WL 2808805, *13 (E.D. Va. June 20, 2014) (same); see also *Craig* v. *Cain*, Docket No. 12-30035, 2013 WL 69128, *2 (5th Cir. January 4, 2013) (*Miller* not watershed because it was "outgrowth of the [Supreme] Court's prior decisions").

[9] See *Penry* v. *Lynaugh*, 492 U.S. 302, 330, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989) (noting that *Teague*'s first exception for retroactivity of new substantive rules "should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense").

[10] The Supreme Court's individualized sentencing cases, which required that a sentencing authority consider mitigating circumstances of the offender and the offense before imposing the death penalty; *Woodson* v. *North Caro-*

*lina*, 428 U.S. 280, 303–305, 96 S. Ct. 2978, 49 L. Ed. 2d 944 (1976) (plurality opinion); *Lockett* v. *Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978); *Skipper* v. *South Carolina*, 476 U.S. 1, 8, 106 S. Ct. 1669, 90 L. Ed. 2d 1 (1986); *Sumner* v. *Shuman*, 483 U.S. 66, 78, 107 S. Ct. 2716, 97 L. Ed. 2d 56 (1987); have been applied retroactively, but they were decided pre-*Teague*. See, e.g., *Dutton* v. *Brown*, 812 F.2d 593, 599 and n.7 (10th Cir.) (noting *Lockett* applies retroactively and applying *Skipper* retroactively), cert. denied, 484 U.S. 870, 108 S. Ct. 197, 98 L. Ed. 2d 149 (1987). Post-*Teague* rules that have expanded the Supreme Court's jurisprudence in this area have been held to be nonretroactive. See, e.g., *Saffle* v. *Parks*, 494 U.S. 484, 494–95, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990).

[11] To the extent that *Whorton* v. *Bockting*, 549 U.S. 406, 127 S. Ct. 1173, 167 L. Ed. 2d 1 (2007), may have narrowed this first element of the "watershed rule" test by requiring that the "bedrock procedural element" must have been "previously unrecognized"; id., 421; we believe that that case imposes an unduly narrow interpretation of *Teague*. We interpret *Teague* for purposes of our retroactivity law to extend to a new procedural rule that fundamentally alters our understanding of an existing bedrock procedural rule.

[12] In *Schriro*, four dissenting justices concluded that the rule set forth in *Ring* v. *Arizona*, 536 U.S. 584, 589, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), that a jury, not a judge, must make the findings necessary to qualify a person for the death penalty, was a watershed procedural rule because *Teague*'s second exception "asks whether the new procedure is 'central to an accurate determination' that death is a legally appropriate punishment." (Emphasis omitted.) *Schriro* v. *Summerlin*, supra, 542 U.S. 359 (Breyer, J., dissenting).

[13] In his dissenting opinion, Justice Zarella relies heavily on the petitioner's presentence investigation report and asserts that, in light of that report, our characterization of the petitioner's sentence as one imposed without consideration of the mitigating factors set forth in *Miller* is unsupported by the record in this case. The absence of any discussion of that presentence investigation report from our opinion, however, is simply reflective of our judgment that it is neither legally nor factually relevant. Although presentence investigation reports required information regarding some of the *Miller* factors, they did not, prior to a recent revision, require examination of others, principal among which is the factor that provided the linchpin of *Miller*'s reasoning and the basis for its presumption against imposing life sentences on juvenile offenders—scientific and psychological evidence demonstrating the lesser culpability of juveniles and their greater capacity for reform. Indeed, the presentence investigation reports did not include a field for the offender's age at the time of the offense (although such information could be calculated from the date of the offense and date of birth fields on the form), nor did they require the reporting officer to examine the factors relevant to *Miller* through a different lens when the offender was a juvenile. Moreover, the presentence investigation report prepared for the petitioner in the present case was submitted to the court two months after he pleaded guilty pursuant to a court indicated plea for a fifty year sentence. Thus, the court determined that a functional life sentence without parole was presumptively an appropriate sentence before it received information on mitigating factors relating to the petitioner's youth. When the court imposed the fifty year sentence two days after the presentence investigation report was prepared, it neither referred to the petitioner's age at the time of the offense nor any other *Miller* factor. Although we presume that the trial court considered the presentence investigation report before imposing sentence in accordance with the court indicated plea; see General Statutes § 54-91a (a); there is nothing *in the record* to suggest that the trial court ever determined that the petitioner was the rare juvenile offender whose acts and history were so uncommon that the presumption against imposing the functional equivalent of life without parole on a juvenile offender had been overcome. See *State* v. *Riley*, supra, 315 Conn. 659 ("the record must reflect that the trial court has considered and given due mitigating weight to [*Miller*'s mitigating] factors in determining a proportionate punishment"). Insofar as Justice Zarella underscores the fact that defense counsel made no real effort to refute the prosecutor's negative characterizations of the petitioner before the court imposed sentence, that fact is unsurprising given that the petitioner had no right to argue for a lesser sentence than that proposed in the court indicated plea.

[14] The respondent also argues that, because the petitioner entered a plea whereby he agreed to serve a fifty year sentence, any mitigation argument before the trial court would have served no purpose. We are not persuaded by this contention. In the present case, the plea was entered pursuant to a

court indicated plea. Thus, there was a clear opportunity for the court to consider the *Miller* factors. There is no evidence in the record before us that such factors were considered when the plea agreement was proposed. See footnote 13 of this opinion. To the extent that the respondent is suggesting that *Miller* cannot apply to a sentence imposed pursuant to a plea agreement, this contention is undermined by the express reference in *Miller* to a juvenile offender's "inability to deal with . . . prosecutors (*including on a plea agreement*)" as one of the concerns that the court sought to remedy. (Emphasis added.) *Miller* v. *Alabama*, supra, 132 S. Ct. 2468. Even outside the context of a court indicated plea, courts have discretion in accepting the terms of a plea agreement reached between the state and a defendant. Presumably in recognition of this fact, many courts post-*Miller* have applied its requirements in cases wherein a juvenile offender accepted a plea deal. See, e.g., *State* v. *Null*, 836 N.W.2d 41, 45, 76 (Iowa 2013); *Aiken* v. *Byars*, Docket No. 27465, 2014 WL 5836918, *1 (S.C. November 12, 2014); *Bear Cloud* v. *State*, 334 P.3d 132, 135 (Wyo. 2014); *Thomas* v. *Pennsylvania*, Docket No. CV-10-4537, 2012 WL 6678686, *1 and n.2 (E.D. Pa. December 21, 2012).

[15] Although the courts reaching this conclusion have done so in considering whether *Graham*'s bar on life sentences without parole for nonhomicide offenders applies to lengthy terms, the logic necessarily would apply with equal force to *Miller*'s rule regarding life sentences for homicide offenders. See, e.g., *Bunch* v. *Smith*, 685 F.3d 546, 551 (6th Cir. 2012) (acknowledging that eighty-nine year sentence "may end up being the functional equivalent of life" but concluding that *Graham* only applies "if [the] state imposes a sentence of 'life' "), cert. denied sub nom. *Bunch* v. *Bobby*,      U.S.      , 133 S. Ct. 1996, 185 L. Ed. 2d 865 (2013); *State* v. *Kasic*, 228 Ariz. 228, 231, 233, 265 P.3d 410 (App. 2011) (consecutive sentences totaling 139 years imprisonment not constitutionally excessive); *Guzman* v. *State*, 110 So. 3d 480, 482, 483 (Fla. App. 2013) (sixty year sentence not improper because "[w]hile we understand the temptation to acknowledge that certain term-of-years sentences might constitute 'de facto' life sentences, we are compelled to apply *Graham* as it is expressly worded, which applies only to actual life sentences without parole"); *Adams* v. *State*, 288 Ga. 695, 696, 701, 707 S.E.2d 359 (2011) (twenty-five year sentence not improper because "[n]othing in the [c]ourt's opinion [in *Graham*] affects the imposition of a sentence to a term of years without the possibility of parole" [internal quotation marks omitted]); *State* v. *Brown*, 118 So. 3d 332 (La. 2013) (four consecutive ten year sentences not effective life sentence because "holding [in *Graham*] . . . applies only to sentences of life in prison without parole, and does not apply to a sentence of years without the possibility of parole").

[16] Compare *People* v. *Rainer*, Docket No. 10CA2414, 2013 WL 1490107, *1, 12 (Colo. App. April 11, 2013) (112 year sentence with opportunity for parole when defendant reached seventy-five years old was de facto life sentence without parole), *Brown* v. *State*, 10 N.E.3d 1, 8 (Ind. 2014) (150 year sentence is effective life sentence), *State* v. *Null*, 836 N.W.2d 41, 71 (Iowa 2013) (52.5 year sentence is "sufficient to trigger *Miller*-type protections"), and *Bear Cloud* v. *State*, 334 P.3d 132, 136, 142 (Wyo. 2014) (parole eligibility after forty-five years imprisonment constitutes de facto life sentence), with *People* v. *Lucero*, Docket No. 11CA2030, 2013 WL 1459477, *1, 12 (Colo. App. April 11, 2013) (eighty-four year sentence not effective life sentence without parole), *Thomas* v. *State*, 78 So. 3d 644, 646 (Fla. App. 2011) ("[w]hile we agree that at some point, a term-of-years sentence may become the functional equivalent of a life sentence," fifty year sentence is not functional equivalent), and *Ellmaker* v. *State*, Docket No. 108,728, 2014 WL 3843076, *10 (Kan. App. August 1, 2014) (fifty year sentence is not functional equivalent of life sentence without parole).

[17] See, e.g., *People* v. *Sanchez*, Docket No. B230260, 2013 WL 3209690, *6 (Cal. App. June 25, 2013) (fifty years not effective life sentence because "[i]t is entirely possible that appellant will become eligible for parole or release during his lifetime"), cert. denied,      U.S.      , 134 S. Ct. 950, 187 L. Ed. 2d 814 (2014); *People* v. *Lucero*, Docket No. 11CA2030, 2013 WL 1459477, *1, 3 (Colo. App. April 11, 2013) (eighty-four year sentence not effective life sentence when defendant was eligible for parole at age fifty-seven because he has meaningful opportunity for release within his natural lifetime).

[18] We note that, although the legislature is free to create and define Connecticut's sentencing scheme; see *State* v. *Heinemann*, 282 Conn. 281, 311, 920 A.2d 278 (2007); we are not constrained by the legislature's definition of life imprisonment as a sixty year term. We are charged with interpreting

the eighth amendment to the federal constitution in light of the Supreme Court's decision in *Miller*. Whether *Miller* applies to sentences shorter than the legislatively defined "life imprisonment" of sixty years is, therefore, a question for this court and not for the legislature. See *Graham* v. *Florida*, supra, 560 U.S. 67 (although legislative enactments are "entitled to great weight . . . the task of interpreting the [e]ighth [a]mendment remains our responsibility" [citation omitted; internal quotation marks omitted]); *Kerrigan* v. *Commissioner of Public Health*, 289 Conn. 135, 260, 957 A.2d 407 (2008) ("it is the role and the duty of the judiciary to determine whether the legislature has fulfilled its affirmative obligations within constitutional principles" [internal quotation marks omitted]).

[19] In *State* v. *Taylor G.*, 315 Conn. 734, 744, 110 A.3d 338 (2015), this court concluded that a mandatory minimum sentence of ten years imprisonment does not implicate the concerns articulated in *Roper*, *Graham* and *Miller*.

———————————————